# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
June 23, 2009 Session

## STATE OF TENNESSEE v. GARY LYNN HARVEY

**Appeal from the Criminal Court for Knox County**
**No. 79665     Ray Lee Jenkins, Judge (trial);**
**Kenneth F. Irvine, Judge (motion for new trial)**

---

**No. E2008-01081-CCA-R3-CD - Filed December 30, 2010**

---

Appellant, Gary Lynn Harvey, was found guilty by a Knox County Criminal Court jury of assault, a Class A misdemeanor, and disorderly conduct, a Class C misdemeanor. See Tenn. Code Ann. §§ 39-13-101 & 39-17-305. The trial court sentenced Appellant to eleven-months, twenty-nine days on probation for the assault conviction and to thirty days on probation for the disorderly conduct conviction, with the sentences to run concurrently. On appeal, Appellant contends that the trial court erred by: (1) refusing to dismiss the disorderly conduct charge because the presentment was insufficient; (2) refusing to dismiss the disorderly conduct charge because section 39-17-305(b) is unconstitutionally vague and overbroad; (3) finding the evidence sufficient to support his conviction for disorderly conduct; (4) finding the evidence sufficient to support his conviction for assault; (5) not declaring a mistrial due to an officer's conduct during jury deliberations; (6) not finding prosecutorial misconduct after Appellant was charged with assaulting an officer who denied being assaulted; (7) not declaring a mistrial following the discharge of a juror during deliberations and the recall of an alternate juror who had already been discharged; (8) not providing Appellant with a written copy of the jury instructions before his closing argument; (9) incorrectly charging the jury on reasonable doubt; (10) incorrectly charging the jury on self-defense; (11) incorrectly charging the jury on lawful resistance; (12) denying him the right to present a complete defense by erroneously excluding newspaper articles as hearsay evidence; (13) violating his Sixth Amendment right to confront witnesses; (14) improperly conducting voir dire; (15) denying him the right to present a complete defense by erroneously excluding witness testimony and by granting the State's motion to quash subpoenas against the Knoxville Sheriff and two chief deputy sheriffs; (16) refusing to grant a change of venue; and (17) denying his right to a speedy trial by delaying in ruling on his motion for new trial. Because Appellant was denied his constitutional right to a jury trial when the trial court substituted a discharged alternate juror for a disqualified original juror during deliberations, we reverse the judgments and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed, Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined. JOSEPH M. TIPTON, P.J., not participating.

Herbert S. Moncier, Knoxville, Tennessee, for the appellant, Gary Lynn Harvey.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Randall E. Nichols, District Attorney General; Patricia Cristil and William Jeff Blevins, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

This case concerns an altercation that occurred after police officers responded to a noise complaint at Appellant's apartment. Knox County Sheriff's Sergeant Julian Michael Evans testified that on May 10, 2003, he was employed by the Sheriff's Department but was not on duty. Instead, he was working as a courtesy officer for Fox Lake Apartments ("Fox Lake") in Knoxville, where he lived. His duties as a courtesy officer included investigating noise complaints, which is why he went to Appellant's apartment on May 10. He said that on that night, he drove a patrol car, carried his gun, and wore a Sheriff's Department polo shirt and badge.

Sergeant Evans testified that he heard a "pornographic noise" coming from a stereo speaker sitting on the patio outside Appellant's apartment. He stated that when he knocked on Appellant's apartment door and identified himself to a man who answered, the man stated that he did not live in the apartment and shut the door. He said that Appellant then opened the door and asked "who the hell" he was. Sergeant Evans said that he told Appellant he was a courtesy officer there to investigate a noise complaint. He said that Appellant said he would "have something for" him if he came back to the apartment and slammed the door in his face.

Sergeant Evans testified that the noise did not stop and that he returned to his car to call for back-up. He said people were leaving a party at Appellant's apartment. He stated that Appellant and another man were on the balcony and that they flipped cigarette butts at him. He said that five or ten minutes after he called for back-up, Officers Eric Tipton and Benjamin Gresham arrived in patrol cars and in uniform. Sergeant Evans said that after an

-2-

initial discussion, all three climbed the steps to Appellant's apartment.

Sergeant Evans testified that Officer Tipton knocked on Appellant's door, which Appellant opened quickly. He said there were eighteen to twenty-two inches between Appellant and him. He said that Appellant looked at the officers from left to right and that when his eyes stopped on Sergeant Evans, he said, "I told. . . ." He said that Appellant's arm came out of the door in a "very aggressive manner" and that he grabbed Appellant's arm before it could reach his face. He said that he feared Appellant was going to strike him. He stated that Appellant pulled backward and that because he did not let go of Appellant's arm, he went into the apartment.

Sergeant Evans testified that he did not let go of Appellant's arm when he felt Appellant fall to the ground and that when they landed, he could feel someone else land on top of him. He said he saw Officer Tipton trying to control Appellant's other arm. He stated that after a few seconds of struggling, he and Officer Tipton handcuffed Appellant.

Sergeant Evans testified that he searched Appellant's apartment for the other man he had seen but did not find him. He said that the "pornographic noise" came from Appellant's television, which he unplugged to stop the noise. He stated that he pulled the speaker away from the door and shut the door. He said he and the other officers escorted Appellant to a patrol car.

Sergeant Evans testified that when he asked Appellant if he was okay, Appellant said his shoulder hurt. Sergeant Evans said he called an ambulance and accompanied Appellant to Parkwest Hospital. He said that after four hours at Parkwest Hospital, Appellant was taken into custody.

Sergeant Evans testified that Officer Tipton obtained arrest warrants for Appellant in relation to the incident. He said that he never received a subpoena for Appellant's charges and that he never went to General Sessions Court on the warrants. He stated that he later found out that he was being sued by Appellant and that Appellant's criminal case had been dismissed.

On cross-examination, Sergeant Evans testified that he lived at Fox Lake rent free in return for serving as a courtesy officer. He stated that he did not know who made the noise complaint to the answering service. He said he understood that Officer Tipton was going to complete an arrest report on Appellant. He agreed that Officers Tipton and Gresham were both his friends.

Sergeant Evans testified that when he and the other officers knocked on Appellant's

door, his intent was to ask him to turn down the noise. He said that after Officer Tipton knocked, Appellant swung his arm toward Sergeant Evans's face until Sergeant Evans stopped it before it reached his head. Sergeant Evans admitted that, during a deposition related to Appellant's civil case, he demonstrated Appellant's movement by pointing his finger. But Sergeant Evans testified at trial that Appellant's movement was a swinging one, not pointing or gesturing.

Sergeant Evans testified that after Appellant filed a civil suit against him, he looked at Officer Tipton's arrest report with one of his attorneys. He stated that he disagreed with the characterization in the report of Appellant's reaction at the door as a "defensive stance." He agreed with a sentence in the arrest report that read: "Appellant was unsteady on his feet, had bloodshot eyes, a strong odor of alcoholic beverage about his person." He disagreed with a statement in the arrest report that said Appellant began fighting after being handcuffed. He said that from the moment Appellant swung at him, Appellant was under arrest for assault. He agreed that Officer Tipton wrote in the arrest report that Appellant was handcuffed for public intoxication. He agreed that the presentment handed down on May 4, 2004, did not contain a charge for resisting arrest.

Sergeant Evans testified that he attached one of Appellant's handcuffs to the gurney for the ambulance ride but did not know if Appellant remained handcuffed at the hospital. He said that he left the hospital before Appellant was released and that he was not the officer who transported Appellant to the penal farm. He stated that when he last saw Appellant at the hospital, Appellant had puffy eyes and a "little knot" on his head. He said Appellant's eyes were somewhat puffy when he first came to the apartment door.

Sergeant Evans testified that he remembered seeing Appellant's face on the front page of the Knoxville News Sentinel after the incident and that in the photograph, Appellant looked worse than he had at the hospital. He said that he did not remember an abrasion over Appellant's left eye or that the eye was as puffy as in the photograph. He said he did not remember seeing any marks on Appellant's sides or if Appellant was wearing glasses.

Sergeant Evans testified that as a supervisor in the Sheriff's Department, he distributed court subpoenas to officers on his shift. He agreed that he was subpoenaed to appear in court for Appellant's case on July 16, 2003, and was then served with a subpoena on July 17, 2003, to appear in court on August 15, 2003. He acknowledged that he worked the night shift on July 16 and August 15, 2003.

Sergeant Evans testified that he was served with a federal lawsuit after the incident. He said that he met with Carlton Bryant, an attorney who worked with the Knox County Sheriff's Department, on or about May 4, 2004, so that Mr. Bryant could help him

-4-

understand the lawsuit.  He agreed that after he and Mr. Bryant met, he went with Officer Tipton and Officer Gresham to the District Attorney's Office on the same day.  He agreed that he was represented in the civil suit by Knox County Law Director John Owens and by Robert Watson, who was appointed by Knox County.

Sergeant Evans testified that he could see eight people in Appellant's apartment the first time he went to the door.  He estimated that the door was thirty-four inches wide.  He agreed that in his deposition testimony, he said that after he grabbed Appellant's arm, he would not let it go despite Appellant's attempt to pull it back.  He said that once he and Appellant were on the ground, Appellant kicked at Officer Gresham.  He stated that after Appellant was on the floor, the officers handcuffed him within five or six seconds and that Appellant did not fight during the seconds he was being handcuffed.  He denied that there was a fight with Appellant after he took control of Appellant's arm.   He said he never saw an officer strike Appellant.

Sergeant Evans testified that Frank Vettori was another attorney representing him in the civil case.  He said that the Knox County Sheriff's Department took no disciplinary action against him.  He identified a card sent to him by Steve Williams, the owner of Fox Lake.  He identified a suspect information document from the Sheriff's Department and admitted that he had never seen the type of facial and head injuries shown on the document occur as a result of handcuffing a person.

On redirect examination, Sergeant Evans testified that he was not on duty on May 10, 2003, but that Officers Tipton and Gresham were.  He said that one of the officers was assigned to the area that contained Fox Lake and one was assigned to an adjoining area.  He said that he received a copy of the federal civil lawsuit through his interdepartmental mail.  On recross-examination, Sergeant Evans testified that he told the Sheriff's Department attorney and his other attorneys the truth when he discussed the case.

Thomas Eric Tipton testified that on May 10, 2003, he was an officer with the Knox County Sheriff's Department.  He stated that he left the Sheriff's Department in November 2003 to become a real estate agent.  He said that he was dispatched to a disturbance at Fox Lake in the early morning hours of May 10, 2003.

Officer Tipton testified that when he arrived at Fox Lake, he saw Sergeant Evans standing outside his patrol car and Officer Gresham arriving in another patrol car.  He said he heard what he thought was loud music coming from the third floor of the building and saw Appellant pacing back and forth on the balcony.  He said he heard the sound as he was driving up with his car window down.  He stated that as he listened to the "music," he realized that it was "pornographic" and that it was coming from external speakers on the

balcony.

Officer Tipton testified that when he pointed to Appellant while talking to Sergeant Evans, Appellant flipped a cigarette butt off the balcony at him and yelled, "F*** you." He said that he, Sergeant Evans, and Officer Gresham went to Appellant's doorway with him in front so that the occupants would see a fully uniformed officer. He stated that when he knocked on the doorway, Appellant appeared. He said that his gun was on his left side and that he turned his left side away from Appellant to keep his gun as far from Appellant as possible. He said that Appellant took a "stagger step" and a "defensive stance" in the doorway with his hands above waist level.

Officer Tipton testified that he saw Appellant's hands come toward Sergeant Evans and saw Sergeant Evans secure the hand that came closest to him. He said that when Appellant pulled back, Sergeant Evans crossed over the threshold. He said that he immediately went into the apartment to assist Sergeant Evans and that he tried to secure Appellant's free hand as Sergeant Evans tried to hold onto the other hand. He said he was trying to get both of Appellant's hands behind his back and that Appellant flailed with the unrestrained arm going back and forth. He said that they were struggling between the threshold and a tiny, dimly lit hallway and that all three were bouncing into walls.

Officer Tipton testified that he, Sergeant Evans, and Appellant fell to the ground in the hallway and that while on the ground, he was still attempting to secure Appellant's hand. He said that he helped handcuff Appellant but that he did not remember if the handcuffs were his or another officer's. He stated that Appellant was lying face-down after he was handcuffed. He said he walked five or six feet away from Appellant and looked out the doorway to make sure that no one escaped the apartment. He said that for security reasons, the other two officers searched places in the apartment that were big enough to hide a person. He said that he and the other officers helped Appellant to his feet and assisted him down the stairs.

Officer Tipton testified that he saw a television in the apartment. He said it was clear that there was something pornographic playing on the television and that the sound coming from the external speakers was also coming from the television.

Officer Tipton testified that after he and the other officers took Appellant down the stairs, they placed him in the back of a patrol car. He said Appellant complained of pain in his shoulder. He said that they called dispatch for an ambulance and that the ambulance personnel checked Appellant and said he seemed to be okay. He stated that Appellant requested further medical attention and that the ambulance took him to the hospital with Sergeant Evans riding with him. He said that he followed the ambulance to Parkwest

Hospital but did not see Appellant again after they arrived.

Officer Tipton testified that he completed the paperwork on the incident and told the magistrate about it. He said that he received a subpoena to testify in sessions court about Appellant's case and that he responded that he was available and on duty for the court date. He said his name was on the log as available for court but that he was never called to testify.

On cross-examination, Officer Tipton testified that he noted the time of his call to Fox Lake on the arrest report as 2:17 a.m. He agreed that the arrest report did not mention pornographic sounds and instead said that Appellant was "yelling and causing a disturbance." He said that he was not wearing black gloves on that night and that he did not remember seeing black gloves on the other officers. He said that about a minute passed between the time he arrived at Fox Lake and when he and the other officers went to Appellant's door. He said that when he knocked on the door, he said, "Sheriff's Department."

Officer Tipton testified that when Appellant opened the door, he was unsteady on his feet and that he could see Appellant's bloodshot eyes. He said that about five seconds passed between Appellant opening the door and saying something. He stated that he could smell alcohol as he helped to handcuff Appellant.

Officer Tipton testified that Appellant pulled away from him forcefully as he attempted to handcuff Appellant. Officer Tipton said he "was bounced down the hall with force." He said that Appellant's doorway measured "thirty-something" inches and that the hallway was slightly wider. At the trial, Officer Tipton looked at a ruler in comparison to Appellant and said that Appellant appeared to be thirty-two inches wide. He denied knowing that anyone's head was pushed into the wall during the struggle, but he remembered being "smacked" into the wall.

Officer Tipton testified that after he stopped working for the Sheriff's Department, the sheriff's secretary called him to come in and meet with Mr. Bryant. He said that he was never served with the civil lawsuit but that before he received the call from the sheriff's secretary, a family member notified him of the newspaper article about the lawsuit. He agreed that he, Mr. Bryant, Sergeant Evans, and Officer Gresham subsequently met at the District Attorney's Office.

Officer Tipton testified that when he met with the other officers at the District Attorney's Office, he had not seen the arrest report or warrants charging Appellant since the night he completed them and that he was not shown the documents during the meeting. He said he did not appear before the grand jury. He said that there were two lines on the arrest report that he had whited out on the night he wrote it. Officer Tipton testified that he,

Sergeant Evans, and Officer Gresham were in the same room when they were deposed on April 5, 2005.

Officer Tipton testified that on May 10, 2003, he appeared before a judicial commissioner and prepared and swore to warrants charging Appellant with disorderly conduct, resisting arrest, and public intoxication. He said that the charge of resisting arrest was because Appellant had assaulted Sergeant Evans but that he did not want to "stack[] charges" on Appellant by also charging him with assault.

Officer Tipton testified that in response to the subpoena to appear in court on July 16, 2003, he either appeared at the courthouse or called and said that he was available to drive in and testify if needed. He stated that he did not receive a second subpoena that was dated July 17, 2003. He said that he met with an attorney, Mr. Watson, twice and that Officer Gresham was there both times but Sergeant Evans only once.

Knox County Sheriff's Department Officer Benjamin Gresham testified that he was on duty on May 10, 2003, and that he was called to back up another officer at Fox Lake. He said he parked his patrol car behind Sergeant Evans's car and saw Appellant pacing on the third-floor balcony. He stated that Sergeant Evans pointed at Appellant and that Appellant flipped a cigarette butt to the parking lot and yelled, "F*** you."

Officer Gresham testified that from the parking lot, he heard "pornographic noises" coming from the apartment and that Appellant and another person were on the balcony. He said that Officer Tipton knocked on the door and yelled, "Sheriff's Department." He said that when the officers were at the door, he was on the right and could see the window but not the full doorway. He said that Appellant opened the door and that he saw Appellant's hand come out with an "enclosed fist." He stated that Sergeant Evans grabbed Appellant's arm and that they were pulled into the apartment.

Officer Gresham testified that from what he could see, Sergeant Evans and Officer Tipton were each trying to restrain one of Appellant's arms. He said that during the struggle, which lasted seven to ten seconds, he grabbed one of Appellant's feet and bent it back toward his buttocks in an attempt to make Appellant stop struggling.

Officer Gresham testified that after Appellant was handcuffed, he and Sergeant Evans "did a sweep" of the apartment to make sure that no one else was there. He stated that the loud noise was coming from the television and that he unplugged it. He said that he could smell alcohol on Appellant as he took Appellant to a patrol car. He said that when he asked Appellant if he was all right, Appellant responded by making a comment about Officer Gresham's weight. He said he walked away from Appellant at that point and left the scene

a couple of minutes later.

On cross-examination, Officer Gresham reviewed a diagram he drew during his deposition that showed the officers' positions at Appellant's door. At defense counsel's request, Officer Gresham, Sergeant Evans, Officer Tipton, and Appellant all stood in the positions on the diagram. Officer Gresham stated that from his position at the door, he could see Appellant's arm from the middle of the forearm to the hand. He agreed that if Appellant had stepped outside the door, he would have seen Appellant's full body. He said he saw Sergeant Evans grab Appellant's arm. He stated that when the officers and Appellant entered the hall, there was very little room and that he "piled" onto the floor with the other officers and Appellant.

Officer Gresham testified that the only physical contact he had with Appellant was when he pushed Appellant's foot toward his buttocks during the struggle in the hall. He said that his purpose in taking Appellant's foot was to inflict pain so that Appellant would give up his arms to be handcuffed. He said Appellant was holding his unrestrained arm under his chest.

Officer Gresham testified that when he and Officer Tipton made a sweep of Appellant's apartment, they looked in closets but did not take out belongings and did not touch dressers or beds. He denied ripping Appellant's shirt and did not remember the shirt being ripped when Appellant was sitting in the patrol car. He stated that Appellant did not assault him.

Officer Gresham testified that Sergeant Evans testified before the grand jury and presented the charges against Appellant. On redirect examination, Officer Gresham testified that he did not prepare the indictment.

Linda Guile Johnson testified that her apartment was located one floor below and to the left of Appellant's apartment. She said that on May 10, 2003, she was awakened by loud talking in the parking lot and loud music that seemed to be coming from the apartment directly on top of hers. She said that it sounded like a party was going on in the parking lot and that she heard bottles breaking there. She said that the music sounded like rock-n-roll, but she did not recognize it as pornographic. She stated that her mother lived with her and that by the time she woke up, her mother had called the police. She said that the disturbance stopped after the police arrived and that police officers did not come to her apartment to ask about her mother's complaint.

On cross-examination, Ms. Johnson testified that she did not look out the window when she heard the noise and that she was able to go back to sleep after the noise stopped.

Knox County Chief Deputy Law Director John Edward Owings testified that he represented Knox County in a civil suit filed by Appellant against the county. He stated that he also represented Sergeant Evans and Officers Tipton and Gresham in their official capacities. He identified the original booking photograph of Appellant, provided to him by the Sheriff's Department. He identified the original arrest report for the May 10, 2003 incident.

Deputy Clerk Barbara Witt, a supervisor with the Criminal Division of the Knox County General Sessions Court, testified that she was subpoenaed to bring records pertaining to warrants charging Appellant with resisting arrest, public intoxication, and disorderly conduct. She produced the warrants for the three charges and said that the warrants included any documents pertaining to the case.

Defense counsel recalled Officer Gresham, who identified a subpoena issued to him for Appellant's court date on July 16, 2003, and a second subpoena issued for Appellant's court date on August 15, 2003. He said that "not on court date" had been stamped on the bottom of the first subpoena but that he did not know who stamped it. He stated that the phrase meant that the date did not fall on one of the days the Sheriff's Department listed as convenient for him to appear in court, which were usually those when he was assigned to the day shift. He said that he did not receive the subpoena for either court date. Officer Gresham reviewed payroll sheets for those dates and said that he was on a holiday on July 16, 2003, but was working the day shift on August 15, 2003.

Susan Grady Correro testified that she worked as the property manager for Fox Lake. Ms. Correro said that she hired Sergeant Evans as a courtesy officer at Fox Lake and that the position was typically filled by a police officer. She stated that in exchange for his services, Fox Lake gave Sergeant Evans free rent on an apartment that rented for $670 a month in 2003.

Ms. Correro testified that when a resident had a problem, he or she called the apartment office number, which was directed to an answering service. She said that someone at the answering service then called the appropriate employee, which for a noise complaint would be a courtesy officer. She identified a log report of the pager calls from the apartment building for May 10, 2003, including three complaints from Gail Johnson to the courtesy officer about loud music from neighbors. On cross-examination, Ms. Correro testified that Sergeant Evans received the noise complaint calls on May 10, 2003, when the answering service notified him.

Steve Edward Williams testified that he was a member in Fox Lake General Partnership Condominiums, which owned Fox Lake. He stated that he read about the civil

lawsuit against Fox Lake either in the newspaper or online. He said that he talked with Sergeant Evans about what had happened on May 10, 2003, after he learned about the civil lawsuit. He said he talked to his attorneys after learning about the civil lawsuit but that he did not talk to the county's attorneys.

Mr. Williams identified a letter that he wrote to Sheriff Tim Hutchison on May 13, 2004. He read the letter, which stated: "Tim, Thank You and our staff for protecting us @ Fox Lake. The DA's failure to prosecute Harvey left us (the Williams Co.) your officers, and yourself open to the ridiculous lawsuit filed against all of us. Thank you again! Steve."

Mr. Williams identified a letter that he wrote to Sergeant Evans on May 13, 2004. He read the letter, which stated: "Mike, Thank you for your professional handling of this Harvey matter. I appreciate your protection of Fox Lake residents and Fox Lake staff. Thank you for moving so fast to right this wrong that Harvey and Moncier have initiated. Steve" Mr. Williams said that Sergeant Evans helped him gather information and prepare a defense after learning about the civil lawsuit. On cross-examination, Mr. Williams testified that he did not live at Fox Lake and did not know Appellant.

Appellant's sister, Lori Renee Ingram, testified that on May 10, 2003, she went to Parkwest Hospital to see her brother but was only able to speak to him by cellular telephone and see him when an officer escorted him to a police vehicle in handcuffs. She said that she did not hear anything in Appellant's voice to indicate that he was intoxicated. She said Appellant had bruises all over his face and a cut on his forehead. She said that she saw Appellant later that day when he was released from jail and that, although his face was more swollen, his injuries were the same. On cross-examination, Ms. Ingram testified that she was not at Fox Lake on May 9 or 10, 2003, and that she first talked to Appellant on May 10 at about 4:30 a.m.

Appellant's sister, Kimberly Norman, testified that on May 10, 2003, she went to Parkwest Hospital but was only allowed to talk to her brother by cellular telephone. She stated that his voice did not sound as though he was intoxicated but that he sounded scared. She said she saw her brother as he left the hospital and that he looked "beaten up." She viewed Appellant's booking photograph and said that she recognized the wounds in the photograph as those she saw when Appellant left the hospital. On cross-examination, Ms. Norman testified that she had not seen Appellant on May 9 or 10, 2003, before seeing him leave the hospital.

Ernest L. Spalding testified that his son and Appellant went to school together and that he maintained a regular relationship with Appellant. He said that Appellant had a reputation in the community for being "absolutely truthful" and "very peaceful." He said that at about

12:45 a.m. on May 10, 2003, he received a call from Appellant and that Appellant sounded scared. Mr. Spalding stated that Appellant told him a man banged on the door and said he was a police officer but had no badge. Mr. Spalding said Appellant told him that he had opened the door and then shut it. He said he told Appellant to turn out the lights and go to bed. He said that Appellant did not sound intoxicated.

Mr. Spalding testified that about ten minutes later, Appellant called him again and said that two or three police cars were there and that the officers were gathering and putting on gloves. He said he advised Appellant not to open the door and to go to bed. He stated that he did not hear any music or background noise during the calls. He said that he heard banging on Appellant's door and a voice saying, "[c]ome outside," and that he heard Appellant say, "[n]o, I ain't coming out there." He said he heard what sounded like a door slamming open and a scuffling noise before the phone went dead. He said that Appellant called him at 3:30 or 4:00 a.m. on May 10 to say that he was in the hospital and that the officers beat him up and tried to kill him.

On cross-examination, Mr. Spalding testified that when Appellant called him, Appellant said he was standing by the glass doors in his living room and looking out at the police cars in the parking lot. Mr. Spalding agreed that he was not at Appellant's apartment on May 9 or 10. He said that he heard "dead silence" in the background until he heard the banging on the door. He said that starting at about age twenty, Appellant had lived with him and was like a stepson to him.

Appellant's father, Gary Harvey, testified that both he and Appellant were milkmen with Mayfield Dairies. He said that at about 4:30 a.m., he, his wife, two daughters, and other son went to Parkwest Hospital in response to a call from Mr. Spalding. He said he was not allowed to see Appellant until an officer took him from the hospital to a police vehicle. He said Appellant was walking normally but looked like he had been beaten. He said Appellant's tee-shirt was torn and hanging down on his shoulder. He viewed the booking photograph and said Appellant's injuries in the photograph looked similar to those Appellant had when he left the hospital.

Mr. Harvey testified that at 8:30 or 9:00 a.m., he went to Appellant's apartment and found it to be a "wreck." He said that clothes were thrown everywhere, beds were messed up, drawers were pulled out, black marks were on the hallway wall, and a hole was in the wall. He identified photographs he took of the apartment on that day and pointed out the black marks and hole. He said that the hole was at a height of about five feet, five inches and that it was half an inch to an inch deep. He said a picture he took of the television and stereo showed black marks and "scuffle marks" on the wall. He identified the cord on a stereo speaker as being five to six feet long and too short to reach the balcony. He said there were

no speakers on the balcony.

Mr. Harvey testified that after Appellant was released from jail at 2:00 or 3:00 p.m., he took Appellant to Baptist Hospital. He identified two photographs he took of Appellant and one of Appellant's shirt at Baptist Hospital. He noted a rip on the right arm of the shirt toward the collar in the photograph. He identified the shirt itself, which was admitted into evidence.

On cross-examination, Mr. Harvey testified that he had never been to Appellant's apartment before that day but that Appellant was neat in his housekeeping practices when he lived in Mr. Harvey's home. He admitted that Appellant had not lived with him for the last ten years and that he never met Appellant's roommate. He said that the last time he saw Appellant before the incident was at work on May 9. He said he was sure that the tee-shirt admitted into evidence was the one his son wore at Parkwest Hospital on that morning, but he agreed that he did not know when the shirt was torn.

Christopher John Stewart testified that he worked with Appellant for almost six years and was his roommate on the night in question. He said that after work on May 9, he and Appellant helped two men and a woman move into a nearby apartment. He said he and Appellant went to a restaurant, Julio Between the Buns, with six to eight friends and shared one pitcher of beer. He stated that he and Appellant returned to their apartment between 12:30 and 1:00 a.m. and that they talked for a while with people across from them who were playing music. He said that after those people went to bed, he and Appellant invited the new neighbors to their apartment and that one man and one woman came over.

Mr. Stewart testified that when their guests came over, he and Appellant played hip-hop dance music on their stereo. He denied that the music was pornographic. He stated that their guests stayed about thirty minutes and that as they were leaving, the woman came back to say that there was someone at the door. He said he was sitting on the couch as Appellant answered the door to a man who said that he was a security guard and off-duty policeman and that there had been noise complaints.

Mr. Stewart testified that the officer tried to enter the apartment, pointed at him, and yelled, "[d]o you live here?" He said that the officer angrily said that if they did not tell him who lived in the apartment, he was getting warrants and taking them to jail. Mr. Stewart said that the officer put his foot in the door and that Appellant tried to shut the door and told the officer that he needed to take out his foot. He said that after Appellant pushed the door on the officer's foot, the officer pulled out his foot, and Appellant shut the door.

Mr. Stewart testified that he shut off the stereo and television as soon as the officer

-13-

knocked on the door. He said that the stereo was his and that the system included five speakers and one subwoofer. He said that the subwoofer sat on the floor beside the television, two speakers were mounted on the wall behind the television, one sat on top of the television, and two were mounted on the back wall. He stated that none of the speakers would reach the patio door. He said that to unplug the stereo, a person would have to move the entire entertainment center.

Mr. Stewart testified that after the officer left, Appellant called Mr. Spalding. Mr. Stewart said that he turned off the lights and sat on the porch to smoke a cigarette. He said he saw two police cars pull into the driveway and told Appellant that he was leaving because the officers were angry. He stated that the neighborhood was quiet when the police cars arrived. He said that two officers talked to the one who had been at the door and that those officers reached into their cars for what looked like black gloves. He said that Appellant never said "F*** you" to anyone that night and that there was no pornographic music playing. He said Appellant was not intoxicated.

Mr. Stewart testified that when the officers began to climb the stairs, he went out the front door and down the back stairs. He said he sat at the back side of the apartment and did not hear what happened until he heard an ambulance arrive. He said that he thought the officers might be looking for him and that he stayed hidden under a car while he watched the officers talk to Appellant in a patrol car and put him in the ambulance. He stated that after the ambulance left, he stayed hidden for about fifteen minutes because he knew that if they put Appellant in an ambulance, "they'd put me in one."

Mr. Stewart testified that when he went back to his apartment, the door was open, every light was on, drawers were open, and clothes and towels were pulled out or turned over. He said that when he left earlier, the lights were off and the apartment was clean. He said that the hallway wall had black marks on it and a big hole in it that were not there before. He identified the photographs of the hall taken by Mr. Harvey and said that the marks and hole in the photograph were those he saw when he returned to the apartment.

Mr. Stewart testified that when he next saw Appellant, Appellant had bruises all over his face, rashes around his back and side, and an eye that was almost swollen shut. He said that Appellant did not have those injuries before the incident. He acknowledged that he and Appellant went before a judicial magistrate in Knox County to apply for a warrant charging the officers with assault.

On cross-examination, Mr. Stewart testified that when Sergeant Evans came to the door the first time, Sergeant Evans said that there had been noise complaints all night about their apartment. Mr. Stewart said that he and Appellant had not turned on the music until

-14-

between 12:30 and 1:00 a.m.  He said that he stayed away from the apartment for about an hour after he left, including the time that the ambulance was in the parking lot.

Appellant testified that he had never been in a fight before the night in question.  He said that on the evening of May 9, he went to Julio Between the Buns with Mr. Stewart and about eight other people.  He said he and Mr. Stewart returned to their apartment complex afterward and talked to someone in another apartment who was playing music.  He said that he then went to his apartment while Mr. Stewart invited the people they had helped move earlier that evening.  He said he, Mr. Stewart, and a man and woman then sat in the apartment, talking and listening to hip-hop music.  He denied that the music was pornographic.

Appellant testified that as the guests began to leave the apartment, the woman came back to tell him that someone was at the door.  He said that he went to the door and that a man wearing a Sheriff's Department black polo shirt was there and told him that there had been a noise complaint.  He said that he told the officer that the music was not on and that the officer told him in a "mean voice" to turn it down.

Appellant testified that the officer tried to come into the apartment by putting his foot in the door.  He said that he shut the door on the officer's foot and that the officer said that he needed to come in.  Appellant said he told the officer that he had no warrant or reason to come in.  He said that the officer responded that he would have a warrant in five minutes.

Appellant testified that after the officer left, he called Mr. Spalding and then stood in the doorway of his balcony.  He said that Mr. Stewart had turned off the stereo and that nothing was playing.  He said he saw two other officers pull up, talk to the courtesy officer, and put on black gloves.  He said he then called Mr. Spalding again.

Appellant testified that he had never said "F*** you" to anyone and that there was no pornographic music or movie playing that night.  He said that no one flipped a cigarette off the balcony and that there were no speakers on the balcony.  He said that he was terrified as the three officers came up the stairs toward his apartment.  He said that he called Mr. Spalding a second time and that as he was on the telephone, the officers knocked on his door.  He said that even though Mr. Spalding told him not to answer the door, he did because he had done nothing wrong.  He said he slid his cellular telephone into his pocket and left it on because he wanted Mr. Spalding to hear what was happening.

Appellant testified that when he opened the door, one of the officers told him to come outside.  He said that he was right-handed and that when he answered the door, he kept his right hand on the door handle.  He said that when he told the officers that he was not coming

outside, one of them came in and punched him. He said that he threw up his hands defensively, fell against the wall, hit his head on the wall, and fell to the ground. He said that the officers went on top of him and beat him. He said that when his head hit the wall, he saw stars as though he was almost knocked out. He said that after he fell on the floor, one officer stood in a bedroom doorway and beat him about the face while the other two were on each side hitting and kicking him with their boots. He said that he begged them to quit and that they handcuffed him and searched the apartment.

Appellant testified that the officers picked him up and put him into the back of a squad car. He said that when Sergeant Evans asked him if he was okay, he said no and that he needed medical attention. He said that an ambulance came and took him to Parkwest Hospital, where several x-rays were taken of his head and face. He said that he was at Parkwest Hospital for about four hours and that when he left, he was taken in handcuffs to the Knox County Detention Facility. He said he arrived at jail at about 5:00 a.m. and sat in a holding cell until 2:00 or 3:00 p.m. that day. Appellant testified that his picture was taken while he was at the jail.

Appellant testified that he was present at a deposition on April 5, 2005. He agreed that he appeared before a judicial magistrate and presented an affidavit to take out warrants for assault against the three officers and that the magistrate denied the request to issue the warrants.

On cross-examination, Appellant testified that his apartment door stayed shut between the first knock from Sergeant Evans and the second knock when all three officers came to the door. He said that no officer took his arm until he was handcuffed because both arms were pinned under his stomach while he and the officers were on the ground in the hall. He stated that when one of the officers hit him, he "flew" back, hit his head on the wall, and fell to the ground with his arms under his body to catch himself. He said that the officers jumped on top of him when he fell on the floor. He said that the officers did not touch his arms and handcuff him until he asked them to "please quit." He admitted that there was a struggle. He said that he did not played loud music, throw cigarettes, or use profanity that night.

## ANALYSIS

### I. DISMISSAL OF DISORDERLY CONDUCT CHARGE (Issues 1 and 2)

Appellant contends that the disorderly conduct charge in count four should have been dismissed because the presentment failed to mention certain elements, including the necessary mens rea. Alternatively, he contends that count four should have been dismissed because Tennessee Code Annotated section 39-17-305(b) is unconstitutionally vague. The

State rejects both contentions. We agree with the State. To explain why, we must first determine the necessary elements of disorderly conduct as it was charged in this case. Only then can we analyze whether the statute is unconstitutionally vague and whether the presentment is sufficient.

## A. Elements Of Disorderly Conduct In Count Four

We begin, as we must, with the statute. Section 305 states:

(a) A person commits an offense who, in a public place and with intent to cause public annoyance or alarm:
  (1) Engages in fighting or in violent or threatening behavior;
  (2) Refuses to obey an official order to disperse issued to maintain public safety in dangerous proximity to a fire, hazard or other emergency; or
  (3) Creates a hazardous or physically offensive condition by any act that serves no legitimate purpose.
(b) A person also violates this section who makes unreasonable noise that prevents others from carrying on lawful activities.
(c) A violation of this section is a Class C misdemeanor.

Tenn. Code Ann. § 39-17-305. Appellant asserts that subsection (b) is merely a continuation of subsection (a), and thus a (b) violation requires proof of all of the elements listed in (a). That reading borders on the nonsensical. First, a plain reading of the statute excludes Appellant's interpretation. Subsection (a) begins with, "[a] person commits an offense who," and then proceeds to list certain conduct along with geographic and scienter limits. Subsection (b) then begins with, "[a] person *also violates this section* who," and outlines an additional type of conduct. Id. at (b) (emphasis added). That introduction signals that subsection (b) is independent from (a).

Second, the structure of the statute further indicates that (a) and (b) describe two different types of disorderly conduct. Subsection (a) defines a necessary mens rea ("intent to cause public annoyance or alarm") and a necessary location ("in a public place"). It then contains a colon, followed by three types of conduct, all of which are listed in the alternative and all of which require the mens rea and location given before the colon. The final alternative, subsection (a)(3), is proceeded by the conjunction "or." The list concludes with a period. This structure conveys that (a) is a discrete prohibition. If (b) were simply a continuation of (a), and thus required (a)'s culpability and geographic elements, it would be included as one of the alternatives listed after the colon; but, it is not. As if that were not enough, it also includes the "also violates" introduction to prevent any lingering confusion.

In short, Appellant's interpretation of the statute cannot withstand a plain reading.

We therefore conclude that subsection (b) is independent of (a). Thus, (b) does not require that the conduct occur in a public place or that the actor have an intent to cause public annoyance or alarm. Instead, a person engages in disorderly conduct "who makes unreasonable noise that prevents others from carrying on lawful activities." Id. at (b). Appellant correctly notes that (b) does not provide a culpable mental state. When a statute does not expressly require nor plainly dispense with the requirement of a mental state, "intent, knowledge or recklessness suffices to establish the culpable mental state." Id. § 39-11-301(c).

Appellant contends that severing (a) from (b) renders subsection (b) unconstitutionally vague and overbroad because the term "unreasonable noise" and the required culpability are ambiguous. To survive a constitutional challenge for vagueness, "[a penal] statute must 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.'" State v. Lakatos, 900 S.W.2d 699, 701 (Tenn. Crim. App. 1994) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)). "The constitutional test for vagueness is whether a statute's prohibitions are not clearly defined and are thus susceptible to different interpretations as to what conduct the statute actually proscribes." State v. Whitehead, 43 S.W.3d 921, 928 (Tenn. Crim. App. 2000). Yet we do not judge the constitutionality of a statute by theorizing all of its possible applications to determine if any application of the statute could be unconstitutional. Statutes are to be construed in the light of reason. See State v. Netto, 486 S.W.2d 725, 728 (Tenn. 1972). Due process does not require that a statute be drafted with absolute precision. See State v. McDonald, 534 S.W.2d 650, 651-52 (Tenn. 1979). A statute may prohibit some conduct with sufficient clarity, although it may be vague if applied to other conduct. See State v. Butler, 880 S.W.2d 395, 397 (Tenn. Crim. App. 1994). Thus, absent substantial effect upon the exercise of First Amendment privileges or other fundamental liberties, and absent vagueness as to all its applications, a defendant's challenge to a statute is limited to Appellant's own conduct. See State v. Alcorn, 741 S.W.2d 135, 139 (Tenn. Crim. App. 1987).

This court has considered Tennessee Code Annotated section 39-17-305(b) many times and made determinations of what conduct its provisions proscribe. See State v. Alice Cook, No. M1999-00174-CCA-R3-CD, 2000 WL 127285, at *2 (Tenn. Crim. App. at Nashville, Feb. 4, 2000) (holding that a woman made an unreasonable noise sufficient to uphold a conviction for disorderly conduct when she sat on the floor and repeatedly screamed at hospital security guards so loudly it disrupted emergency room services); State v. Ralph Moore, Jr., No. 03C01-9904-CR-00133, 1999 WL 1125235, at *2 (Tenn. Crim. App. at Knoxville, Dec. 9, 1999) (holding that a man made unreasonable noise sufficient to uphold a conviction for disorderly conduct when he repeatedly screamed profanities at police

-18-

officers in a manner that prevented them from conducting an investigation); see also State v. Buford C. Throneberry, No. M2008-00464-CCA-R3-CD, 2009 WL 103630, at *3-4 (Tenn. Crim. App. at Nashville, Jan. 12, 2009) (holding that although the facts showed Appellant repeatedly yelled at a police officer, the evidence did not sustain a conviction for disorderly conduct because it was not established that the yelling interfered with the officer's ability to conduct an investigation or other lawful activities). These cases demonstrate that the term "unreasonable noise" must be read in conjunction with the remainder of the section to determine what conduct it proscribes: an unreasonable noise must be one sufficient to prevent others from carrying on lawful activities. We hold that Tennessee Code Annotated section 39-17-305(b) uses words of common usage with a well understood and generally accepted meaning and enables men of common intelligence to understand what conduct is prohibited. It provides "legally fixed standards" and does not "leav[e] to the personal predilections of an officer the determination of the illegality of conduct." State v. Harton, 108 S.W.3d 253, 259 (Tenn. Crim. App. 2002). It is not vague.

Appellant contends that our reading of subsection (b) is obscured by the ambiguity regarding "[t]he object to which the mental state applies." He asserts that the intent, knowledge, or recklessness culpability requirement of section 39-11-301(c) could be inserted to modify the phrases "make[] unreasonable noise," Tenn. Code Ann. § 39-17-305(b); "prevent[] others from carrying on lawful activities," id.; or—somehow—"intent to cause public annoyance or alarm," id. at (a). We disagree for a number of reasons, the strongest of which being that (a) and (b) are separate, distinct crimes. As between the two (b) phrases, it is not a close call either. The mens rea clearly does not apply to the phrase "prevents others from carrying on lawful activities." The noun that is "prevent[ing]" in (b) is "noise." So the only word that can sensibly be modified by section 301(c)'s mens rea is "makes." Appellant's argument to the contrary is unpersuasive.

Finally, in conjunction with his vagueness argument, Appellant briefly asserts that, if subsection (b) is distinct from (a), then (b) is overbroad because the phrase "unreasonable noise" relies on the subjective determination of those that are disturbed. The State contends that this is merely a repackaged vagueness argument, and we agree. To the extent Appellant raises an overbreadth argument against our construction of section 305(b), we are unmoved.

At the outset, we note that the evidence suggests that Appellant's conduct falls safely within the clearly prohibited conduct. Giving the State the benefit of all reasonable inferences, the evidence indicates that Appellant was blaring loud, "pornographic" music from his back porch in the middle of the night. At least one neighbor repeatedly complained because Appellant's conduct kept her from sleeping. Sergeant Evans informed Appellant that there had been noise complaints. To the extent Appellant could not tell that the music was unreasonably loud and disturbing his neighbors, Sergeant Evans's first visit put him on

notice. But the evidence shows that Appellant did not alter his behavior and may have even become more rowdy. Thus, if Appellant is to show that section 305(b) is unconstitutionally overbroad, he must do so by showing a substantial effect on the exercise of First Amendment privileges or other liberties. See Alcorn, 741 S.W.2d at 139. He does not.

"[A] statute may be challenged as overbroad if it affects a substantial amount of conduct that is constitutionally protected." Harton, 108 S.W.3d at 259; see also State v. Pickett, 211 S.W.3d 696, 702 (Tenn. 2007). But the doctrine "is strong medicine" that should "be used sparingly and only as a last resort." Lakatos, 900 S.W.2d at 701 (quoting Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973)) (quotation marks omitted). As the United States Supreme Court has noted, some laws may be "too broadly worded" and "may deter protected speech to some unknown extent" and reach "a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face." Broadrick, 413 U.S. at 615 (quoted in Lakatos, 900 S.W.2d at 701-02). Despite Appellant's handful of scenarios, we are at that point with section 305(b): the claimed deterrence to protected speech is too speculative to justify invalidation. Regardless, we do not conclude that section 305(b)'s reliance on the term "unreasonably" renders it constitutionally overbroad. Accord Harton, 108 S.W.3d at 258-60 (upholding as neither vague nor overbroad a statute prohibiting driving a motor vehicle so as to follow another motor vehicle "more closely than is *reasonable and prudent*" (emphasis added)).

## B. Sufficiency Of The Presentment

Both the United States and Tennessee constitutions guarantee an accused "the right to be informed of the nature and cause of the accusation." State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997) (citing U.S. Const. amend. VI, XIV; Tenn. Const. art. I, § 9). In Hill, our supreme court held that "an indictment is valid if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." Id. A presentment must also state the facts constituting the offense "in ordinary and concise language, without prolixity or repetition, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." Tenn. Code Ann. § 40-13-202.

"As a general rule, it is sufficient to state the offense charged in the words of the statute, or words which are the equivalent to the words contained in the statute." State v. Griffis, 964 S.W.2d 577, 591 (Tenn. Crim. App. 1997) (footnote omitted). With regard to offenses that neither expressly require nor plainly dispense with the requirement of a culpable mental state:

an indictment which fails to allege such mental state will be sufficient to support prosecution and conviction for that offense so long as

> (1) the language of the indictment is sufficient to meet the constitutional requirements of notice to the accused of the charge against which the accused must defend, adequate basis for entry of a proper judgment, and protection from double jeopardy;
>
> (2) the form of the indictment meets the requirements of Tenn. Code. Ann. § 40-13-202; and
>
> (3) the mental state can be logically inferred from the conduct alleged.

Hill, 954 S.W.2d at 726-27. In State v. Carter, our supreme court expanded its holding in Hill, stating that if the constitutional and statutory requirements outlined in Hill are satisfied, an indictment's reference to the pertinent statute can cure the indictment's omission of the required mental state. 988 S.W.2d 145, 148-49 (Tenn. 1999). "Indeed, Hill and its progeny leave little doubt that indictments which achieve the overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000). Furthermore, "the degree of strictness [of averment] required in a felony indictment . . . is not required in the case of a misdemeanor." State v. Morgan, 598 S.W.2d 796, 797 (Tenn. Crim. App. 1979)).

The presentment in this case stated that "[o]n or about the 10th day of May, 2003 . . . [Appellant] did unlawfully make unreasonable noise, which prevented other persons to the Grand Jurors unknown from carrying on lawful activities, in violation of [Tennessee Code Annotated section] 39-17-305 . . . ."

The presentment provided Appellant sufficient notice to satisfy both constitutional and statutory requirements. It stated each of the elements of the charged offense using the words of the statute, gave the date of the offense, and made reference to the pertinent statute. It sufficiently informed Appellant of the charged offense and provided an adequate basis for a proper judgment and protection against double jeopardy. See Hill, 954 S.W.2d at 726-27. Additionally, the presentment used ordinary and concise language to indicate the offense intended. See Tenn. Code Ann. § 40-13-202. While it did not list a culpable mental state, its reference to "unreasonable noise" and section 305, from which Appellant could logically infer the mens rea under Tennessee Code section 39-11-301(c), cured that omission. See Carter, 988 S.W.2d at 148-49. Appellant is not entitled to relief on this issue.

## II. SUFFICIENCY OF THE EVIDENCE (Issues 3 and 4)

Appellant contends that the evidence was insufficient to sustain his convictions for disorderly conduct and assault. The State says it was, and we agree.

Our standard of review for sufficiency questions is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000).

As explained above, Appellant was convicted of disorderly conduct under Tennessee Code Annotated section 39-17-305(b), which prohibits "mak[ing] unreasonable noise that prevents others from carrying on lawful activities." Appellant contends that there was no evidence to prove that he made unreasonable noise or, if he did make unreasonable noise, that it prevented anyone from carrying on a lawful activity.

Appellant relies on State v. Wilson for the principle that proof must be presented that someone was prevented from engaging in a lawful activity to satisfy the second element of the statute. See 990 S.W.2d 726, 729-30 (Tenn. Crim. App. 1998) (holding that there was insufficient evidence of disorderly conduct in the absence of proof that anyone was prevented from carrying on a lawful activity by Appellant's loud argument on his porch). Yet there was sufficient evidence that neighbors were prevented from sleeping by the loud noise that initially brought officers to Appellant's apartment. Ms. Johnson testified that she and her mother were awakened by loud music and lodged a complaint; Ms. Correro testified that the Johnsons lodged three noise complaints that were conveyed to Sergeant Evans. Moreover, three officers testified that loud and pornographic noise or music came from Appellant's apartment. The evidence thus proved that Appellant was playing some type of loud noise from his apartment at about 2:00 a.m. and that this noise disturbed his neighbors' lawful activities. That is sufficient to sustain Appellant's conviction for disorderly conduct.

Appellant was convicted of one count of assaulting Sergeant Evans under Tennessee Code Annotated section 39-13-101(a)(2), which states: "A person commits assault who . . . [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." Appellant argues first that the evidence was insufficient because the three officers' descriptions of Appellant's actions toward Sergeant Evans were inconsistent. Second,

Appellant argues that the way in which Sergeant Evans pointed in his civil deposition to demonstrate Appellant's actions contradicted his later testimony at trial that Appellant did not point or gesture but attempted to punch him.

The officers' testimony described Appellant's movements variously as a "defensive stance," "taking a swing," an "arm coming forward," and a "hand [coming] out with an enclosed fist." Appellant invokes the "cancellation rule" in an attempt to negate the officers' testimony. However, in order to invoke that rule, the "mutually contradictory statements" must have been made "by the same witness." Church v. Perales, 39 S.W.3d 149, 170 (Tenn. Ct. App. 2000). We do not read any of the individual officers' statements to be mutually inconsistent such that they "cancel or negate each other" as a matter of law. See Bowers v. Potts, 617 S.W.2d 149, 155 (Tenn. Ct. App. 1981). At most, the statements to which Appellant points create credibility issues for the jury. To the extent any of the officers' descriptions of the events at trial contradict prior sworn statements, the contradiction does not negate the trial testimony because the contradiction was adequately explained and the trial statements were corroborated by the other officers. See Church, 39 S.W.3d at 170 ("[I]n order to be disregarded under the so-called cancellation rule, the allegedly contradictory statements must be unexplained and neither statement can be corroborated by other competent evidence."); see also State v. Roger Dale Bennett, No. 01C01-9607-CC-00139, 1998 WL 909487, at *5 n.7 (Tenn. Crim. App. at Nashville, Dec. 31, 1998). We conclude that the jury had ample opportunity to compare the three officers' testimony, as well as to hear Sergeant Evans cross-examined on why he pointed during the deposition. In the light most favorable to the State, the evidence shows that Appellant made a movement toward Sergeant Evans that could reasonably place someone in fear of imminent bodily harm.

Appellant next argues that the physical facts rule makes the officers' testimony describing an assault on Sergeant Evans a physical impossibility because Appellant could not have reached Sergeant Evans while holding the door open with his right hand. Our supreme court has described the physical facts rule as

> the accepted proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence, the testimony can be disregarded. That is, where the testimony of a witness cannot possibly be true, is inherently unbelievable, or is opposed to natural laws, courts can declare the testimony incredible as a matter of law and decline to consider it. . . . [W]here undisputed physical facts are entirely inconsistent with and opposed to testimony the physical facts must control. No jury can be allowed to return a verdict based upon oral testimony which is flatly opposed to physical facts, the existence of which is incontrovertibly established. Courts have made it clear that in order for testimony to be considered incredible as a matter of law, it

-23-

must be unbelievable on its face, i.e., testimony as to facts or events that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature. Thus, for example, if a witness was to testify that he saw the sun set in the east, the court would be free to declare such testimony incredible as a matter of law and disregard it.

State v. Allen, 259 S.W.3d 671, 679-80 (Tenn. 2008) (quotation marks, citations, and ellipses omitted). The rule applies to criminal cases. See State v. Hornsby, 858 S.W.2d 892, 895 (Tenn. 1993). However, it is available "only where the physical facts at issue are well-established and universally recognized physical laws." Allen, 259 S.W.3d at 680 (quotation marks omitted). It "may not be invoked where its application depends upon assumptions or calculations based upon estimates as to speed, distance, time, and other such uncertain matters in the movement of objects." Id. (quotation marks and brackets omitted); see also State v. Israel Dean Bolinger, No. E2008-01576-CCA-R3-CD, 2010 WL 2384889, at *6-7 (Tenn. Crim. App. at Knoxville, June 15, 2010). Nor should it be used to disregard testimony that is capable of different interpretations because the jury is responsible for weighing the evidence. See Allen, 259 S.W.3d at 681. Thus, our supreme court has instructed that the rule be used only "sparingly." Hornsby, 858 S.W.2d at 895.

Because the physical facts rule does not apply to estimates of measurement or distance, it cannot be used to disregard the testimony concerning the placement of each person at the door in this case. Nor can it be applied here because the evaluation of the evidence rests upon "consideration of the comparative credibility of the witnesses." Id. at 896 (quotation marks and citation omitted).

As to both convictions, we will not invade the province of the jury and reweigh the witnesses' testimony. Appellant is not entitled to relief on these issues.

## III. SERGEANT EVANS'S CONDUCT AND JUROR RECALL (Issues 5 and 7)

Appellant contends that the trial court erred by not declaring a mistrial because Sergeant Evans's conduct caused a juror to be discharged and because an alternate juror was recalled after being excused. The State contends that the trial court did not err because there was no manifest necessity for a mistrial. We agree with the State that Appellant was not entitled to a mistrial based upon Sergeant Evans's conduct. We also agree with the State that there was no manifest necessity for a mistrial when a juror was excused for cause during deliberations. But we agree with Appellant that the trial court's action thereafter amounted to structural constitutional error that deprived Appellant his right to a trial by jury.

## A. Background

The record shows that the jury initially retired to deliberate at 11:48 a.m. on August 22. The trial court excused the alternate juror immediately after releasing the jury to deliberate. After an unrelated conference and a recess, the trial court met with counsel because the jury foreman had reported a problem. Without the rest of the jury present, Juror Foster testified that she had overheard a conversation in the hall. She then wrote that she "heard Sergeant Evans speaking to other officers about black gloves covered red and that he would rather see 'Him' on the ground covered with lime." Juror Foster said that she had not discussed what she heard with other jurors but that it had affected her decision.

The prosecutors, defense counsel, and the trial court agreed that Juror Foster could not continue. Defense counsel argued for a mistrial with prejudice because Sergeant Evans's misconduct in the hall had affected the proceedings. Defense counsel offered three possible resolutions:

> First, instruct [Juror Foster] to disregard this and let her continue to sit. Just give her a very stern instruction and let her continue to sit. *Second is to call the other juror back and let them resume their deliberations. The juror that was the alternate. And let them resume their deliberations possibly tomorrow morning with the alternate juror.* And thirdly is 11 jurors. . . . [I]f the Court is going to excuse [Juror Foster], and if the Court is not going to declare a mistrial with prejudice.

(emphasis added). Defense counsel reiterated these three options moments later:

> But now let me make myself clear. I said—I said, number one, let her—give her a strong admonition to disregard it and, if the Court rejects that, then I would go to number two, and that is a mistrial with prejudice, because this has been caused by not only the prosecutor in this case, or not only the alleged victim in this case, but a State agent. Now, I'm not putting it at the feet of [the prosecutors]. I am putting it at the feet of a trained law enforcement officer. . . . Now, *the third alternative would be to call the alternate back in and resume tomorrow morning with 12, including the alternate,* or the first—fourth alternative, which I think would probably be the most expedient, would be to go with 11 jurors. . . . We don't want—we don't want a mistrial without prejudice. . . . My client can't afford that.

-25-

(emphasis added). The court excused Juror Foster and recalled the alternate. The court released the jurors for the day and ordered them to report for deliberation at 9:00 a.m. on August 23, with the alternate juror joining them.

Prior to reconvening, Appellant filed a motion under Tennessee Rule of Criminal Procedure 12(a). But when proceedings resumed, the court did not address the motion. It instead focused on releasing the jury again:

[Court]:        All right. Are we ready for the jury?
[State]:        Yes, your Honor.
[Court]:        All right.
[Defense]:      Your Honor, we had filed—
[Court]:        I know.
[Defense]:      —a reflection of what happened—excuse me?
[Court]:        We'll get to that as soon as I get the jury back to work.
[Defense]:      Yes, sir.
[Court]:        Bring in the jury.
[Defense]:      Is the Court going to voir dire them further on the matters?
[Court]:        No. I've relieved Juror Foster.

The court added the alternate to the jury and instructed the jury regarding how to proceed. This is the court's entire instruction:

All right. Members of the jury, I had to, under the law, relieve Ms. Foster, who was juror No. 6, and replace her with our alternate. Now, ordinarily, in the past procedures, this would have been the end. However, the Supreme Court has provided us with the ability whereby the juror is relieved and our alternate is utilized. And I've done this. However, there is a requirement that you begin your deliberations again so that the alternate will be brought up to—what is commonly called "up to speed" with your deliberations. And you have not been deliberating that long, fortunately, so it should not be that much trouble. So at this point, I want to release you to your deliberations again. Thank you.

After the jury was released to deliberate, defense counsel argued Appellant's motion, which requested three alternative types of relief: (1) dismiss the case with prejudice; (2) declare a mistrial; or (3) strike all three officers' testimony, permit Appellant to present proof of what Juror Foster heard as newly discovered evidence, and conduct a Rule 24 voir dire to discover if other jurors heard what Juror Foster did or were affected by it. Importantly, the motion was *not* premised upon the argument that substituting the alternate juror was

somehow improper nor did counsel make that argument. The motion proceeds from the assumption that the alternate could be substituted. The defense eventually moved for a mistrial "even without prejudice." The trial court denied Appellant's motion. The jury returned its verdicts at 11:02 a.m.

### B. Mistrial – Prosecutorial Misconduct

A mistrial should be declared only if there is a manifest necessity. Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981). The decision to grant a mistrial is within the sound discretion of the trial court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). This court will not disturb that decision unless there is an abuse of discretion. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

Appellant first argues that the trial court erred in not granting a mistrial because of Sergeant Evans's "prosecutorial misconduct" in making the statement that was overheard by Juror Foster. The trial court described Sergeant Evans's comments as "reprehensible" but denied relief because there was no indication that other jurors heard the comments or were affected by them.

The comments attributed to Sergeant Evans do not justify a mistrial. See State v. Millbrooks, 819 S.W.2d 441, 445-46 (Tenn. Crim. App. 1991); Tenn. R. Crim. P. 24(g). The comments did not represent prosecutorial misconduct because Sergeant Evans was a prosecuting witness and a victim—not a prosecutor. Further, there is no evidence that Sergeant Evans was under the prosecutors' control or in their presence when the statement was made. The trial court did not abuse its discretion in refusing to declare a mistrial based on prosecutorial misconduct.

### C. Mistrial – Recall and Substitution of an Excused Juror

Appellant next argues that the trial court erred in not granting a mistrial after substituting a previously excused alternate for the disqualified juror. The State argues that Appellant waived his objection by suggesting the substitution, waiting to argue his motion on the topic until after the jury had retired a second time, and not expressly objecting to the substitution. We conclude that Appellant did not waive this issue and that the trial court's procedure violated Appellant's constitutional and statutory rights. Consequently, Appellant's convictions must be reversed, and the case must be remanded for a new trial.

Tennessee Rule of Criminal Procedure 24(f)(2) addresses the permissible methods for selecting and impaneling alternate jurors. It does not provide a procedure for substituting a juror after deliberations begin. At the time of Appellant's trial, however, the Code provided that "[s]hould a juror, either in a civil or criminal action, during the process of a trial, become so unwell that, in the opinion of the court, the juror is unable to serve, the juror may be discharged, and another juror summoned instanter, impaneled, and the trial recommenced." Tenn. Code Ann. § 22-2-312 (1994) (amended 2008, effective January 1, 2009, to delete this option in its entirety); see also State v. Bobo, 814 S.W.2d 353, 355 (Tenn. 1991). Additionally, our supreme court has said that another permissible procedure is "to discharge the entire panel, declare a mistrial, and continue the cause." Id. at 355. The choice of which option to pursue is a matter for the trial court's discretion. See id. at 355-56. Furthermore, a defendant may waive his right to a twelve-member jury (or any jury at all) and consent to go forward with eleven jurors. See id. at 359; see also Tenn. R. Crim. P. 23.

As detailed below, the trial court did not take any of these options. That was error. Yet it was an error made at the urging of defense counsel. Consequently, the State contends, Appellant has waived any right to complain.

Although the State is correct that defense counsel helped lead the court to this dead end, we do not think that means Appellant waived the issue. First, Appellant's primary request during this episode was for a mistrial—albeit not for the right reason. The suggestion to substitute the alternate was Appellant's backup plan. Second, and more importantly, we do not believe that counsel's argument was sufficient to waive Appellant's constitutional right to a jury trial. Bobo is directly on point. There, a juror in a murder trial speculated during deliberations about whether the defendant had killed her cousin. Bobo, 814 S.W.2d at 354. Despite counsel's misgivings about continuing the trial, the defendant testified that he did not object to substituting the alternate and continuing deliberations. Id. at 358-59. Even with that testimony, our supreme court held that the defendant had not waived his constitutional right to a jury trial:

Of course, it is the prerogative of every criminal defendant to waive his right to trial by jury. If the defendant sees fit to waive his right, it is permissible provided the waiver is made in accordance with the safeguards provided by the constitution and implementing statutes or rules of criminal procedure. If the defendant[] could waive the jury entirely, it stands to reason that [he] could have consented to a trial by the remaining eleven jurors. But, Rule 23 of the Tennessee Rules of Criminal Procedure requires that waivers of trial by jury must be made in writing and with the approval of the court and the consent of the district attorney general. Without formal compliance with Rule 23, the record should clearly show a voluntary relinquishment of the rights to be tried

-28-

by a common law jury. We cannot find that voluntary relinquishment on the record before us.

Id. at 359 (citations omitted). Because the defendant in Bobo took the stand and personally stated that he did not object to continuing deliberations with the alternate, Bobo makes a more compelling case for waiver than does this one. Nevertheless, our supreme court rejected the waiver argument. Id. We reject it as well.

Because Appellant did not waive his right to a jury trial or consent to proceed with eleven jurors, the trial court should have exercised one of two options, either of which involved presenting the evidence anew to a twelve-member jury. Bobo describes those two options, only one of which includes a mistrial. Under the law as it existed at the time of Appellant's trial, it was within the trial court's discretion to deny Appellant's motion for a mistrial and proceed by calling a new juror and starting the process over as if no proof had yet been received. Thus, the trial court's denial of Appellant's motion for a mistrial was not erroneous.

Yet the trial court's procedures from that point on were erroneous. The trial court substituted a previously discharged juror and instructed the jury to restart its deliberations. That procedure is not only unauthorized by statute or rule, but it was specifically condemned by our supreme court in Bobo. 814 S.W.2d at 355-56. Bobo noted that "any alternate not replacing a regular juror *shall* be discharged when the jury retires to consider its verdict." Id. at 355. The trial court in the instant case expressly and properly discharged the alternate juror after releasing the jury to deliberate. "At that point, the discharged alternate is no longer a member of the jury since the function of an alternate juror ceases when the case had been finally submitted." Id. (citing Patten v. State, 426 S.W.2d 503 (Tenn. 1968)). In short, the procedure the trial court used to later recall the alternate was incorrect.

At this juncture, the question is whether the trial court's error was simply procedural (subject to harmless error analysis) or structural (necessitating reversal regardless of prejudice). See id. at 355-58. Bobo hints that some replacement juror errors like this one are merely procedural. Id. at 356 (explaining that its particular "violation of our statutory guidelines and rules . . . reache[d] past the statutory and procedural framework . . . and encroache[d] upon certain constitutional guaranties"). There the error violated the defendant's state constitutional right to a jury trial, which the court described as follows:

Under Article I, § 6 of our constitution, the right of trial by jury must be preserved inviolate. This means that it must be preserved as it existed at common law at the time of formation of the constitution. Among the essentials of the right to trial by jury is the right guaranteed to every litigant in

-29-

jury cases to have the facts involved tried and determined by twelve jurors. Similarly, a litigant has the constitutional right to have all issues of fact submitted to the same jury at the same time.

Id. at 356 (citations omitted).

In explaining how the trial court error in Bobo rose to the level of a violation of this right, the court explained that "[i]t is clear that thirteen jurors participated in the deliberative process, although only twelve ultimately cast a vote." Id. Yet, "it [was] not at all certain that the alternate juror . . . took part in all the deliberations." Id. That is because

without an explicit instruction to [begin the deliberations anew] from the trial judge, we cannot assume that the reconstituted jury panel started from the beginning. Thus, the substitution of jurors after final submission of the case, *coupled with the trial court's failure to instruct the jury to begin deliberations anew*, violated [the] defendant's right to a trial by jury under Article I, § 6 of the Tennessee Constitution.

Id. (emphasis added). This indicates that the improper substitution *combined with the failure to give an instruction* is what transformed the Bobo error from a procedural one into a constitutional one. Conversely, it implies that the substitution was simply a procedural error if made in conjunction with a sufficient instruction. Bobo's discussion of the rules in other jurisdictions lends support for that reading. See id. at 357 (noting that the rules in other jurisdictions "[have] been interpreted as requiring a *clear and unequivocal instruction from the court* that, where an alternate is substituted for a regular juror after deliberations have begun, the jury must begin its deliberations anew") (emphasis added).

Despite those indications that Bobo stands for the proposition that such procedural errors can be saved from becoming structural constitutional errors by a sufficient instruction, the opinion later suggests that is not the case. In holding that the Bobo error was structural, the court reasoned that "[i]t is impossible to say that the remaining eleven jurors would be capable of disregarding their prior deliberations, *even with an instruction to do so*, and become receptive to the alternate's attempt to assert a view that might be non-conforming." Id. at 358 (emphasis added). That reasoning counsels against finding such substitution errors can ever be merely procedural.

Fortunately, this case does not demand we clarify this ambiguity. Even if we were to conclude that some substitution errors are only procedural, the instruction in this case does not pull this error into that category. The court's instruction that "there is a requirement that you begin your deliberations again so that the alternate will be brought up to—what is

-30-

commonly called 'up to speed' with your deliberations," which "fortunately . . . should not be that much trouble," combined with the court's closing that "at this point, I want to release you to your deliberations again," does not clearly and unequivocally instruct the jury to *begin its deliberations anew*. Read generously, it could be given that meaning. However, especially given the court's instruction to bring the alternate "up to speed," it more naturally reads as though the alternate is to be briefed on what has transpired in the deliberations rather than as though the deliberations are to start again from scratch. We therefore conclude that, to the extent an instruction can save a juror substitution error from being a structural constitutional error, the trial court's instructions in this case were deficient.

We therefore conclude that the trial court erred in substituting the alternate juror for the disqualified juror. That error violated Appellant's state constitutional right to a jury trial. "[A]ny errors affecting the constitutional right to trial by jury will result in such prejudice to the judicial process that automatic reversal is required." Bobo, 814 S.W.2d at 358. In short, this was a structural error requiring automatic reversal. See id. The judgments must therefore be reversed.

### D.  Double Jeopardy

Having determined that the trial court erred in substituting the discharged alternate in the middle of deliberations, we must now consider whether Appellant's constitutional protections against double jeopardy bar retrial. We conclude that they do not.

Under the Double Jeopardy clause of the Fifth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." Similarly, article I, section 10 of the Tennessee Constitution states that "no person shall, for the same offence, be twice put in jeopardy of life or limb." These clauses protect an accused from: (1) a second prosecution following an acquittal; (2) a second prosecution following conviction; and (3) multiple punishments for the same offense. State v. Denton, 938 S.W.2d 373, 378 (Tenn. 1996). As this court recently explained:

> The protection from multiple prosecutions embodied in the double jeopardy clauses of both the state and federal constitutions encompasses the defendant's right to have his trial completed before a particular tribunal. The Supreme Court enumerated the reasons why this valued right merits constitutional protection:
>> Even if the first trial is not completed, a second prosecution may be grossly unfair. It increases the financial and emotional burden on the accused, prolongs the period in which he is

stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. The danger of such unfairness to the defendant exists whenever a trial is aborted before it is completed. Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial. [Arizona v. Washington, 434 U.S. 497, 503-05 (1978)].

State v. Rocky Joe Houston, __S.W.3d__, No. E2009-00352-CCA-R9-CD, 2010 WL 744412, at *10 (Tenn. Crim. App. at Knoxville, Mar. 3, 2010) (quotation marks, citations, and brackets omitted).

However, "[t]here are recognized exceptions to the prohibition against double jeopardy." Ahern v. Ahern, 15 S.W.3d 73, 80 (Tenn. 2000). Foremost, perhaps, is the provision that a reversal for trial error does not normally bar a retrial. See, e.g., State v. Hutcherson, 790 S.W.2d 532, 534 (Tenn.1990).

Also, "a retrial is permitted when the defendant has actively sought or consented to a mistrial." Id. In addition, "[r]etrial may be permitted if the termination of the proceedings was caused by error or misconduct of the defense counsel and there was no feasible alternative to halting the proceedings." Knight, 616 S.W.2d at 596. Furthermore, a party cannot "stand silently by while the trial court commits an error in procedure," thereby depriving the trial court of "an opportunity to cure a situation that one or both parties perceive to be in error." State v. Mounce, 859 S.W.2d 319, 323 (Tenn. 1993).

Although defense counsel did not commit misconduct, these exceptions apply to allow retrial here. At a minimum, defense counsel consented to a mistrial. See Ahern, 15 S.W.3d at 80; accord Knight, 616 S.W.2d at 596 (finding the prohibition on double jeopardy did not apply where, even though counsel "cannot be said to have objected to the erroneous action of the court," but "[h]e actively [sought] such dismissal and in no sense did he seek to preserve appellant's right to have trial on the merits occur before the jury which had been impaneled to try the case"). Not only did counsel not object to the errant substitution, it led the court to the error by recommending that procedure. Accord Mounce, 859 S.W.2d at 322-23 ("[W]hen a defendant chooses not to object to the mistrial and give the trial court an opportunity to correct the error, consent [to a second trial] may be inferred and, therefore, double jeopardy will not bar a subsequent prosecution."). Consequently, we conclude that

Appellant's constitutional protections against double jeopardy do not prohibit a new trial in this case.[1]

## IV. PROSECUTORIAL MISCONDUCT (Issue 6)

Appellant contends that the State committed misconduct by prosecuting Appellant for assaulting Officer Gresham even though the victim previously denied being assaulted. Appellant argues that the prosecutors knew of Officer Gresham's sworn denial but persisted with the charge in an effort to "overcharge" Appellant and bolster the State's case for the other assault counts. The State responds that it was appropriate to try Appellant on the charges for which the grand jury found probable cause. We agree with the State.

Tennessee courts have referred to overcharging as a prosecutorial practice of charging a defendant with a greater charge in seeking a conviction for a lesser-included offense. See State v. Adler, 92 S.W.3d 397, 403 (Tenn. 2002) (holding that a defendant is entitled to have an indictment for a greater offense expunged when he is convicted of a lesser-included offense because of the permanent harm possible to a defendant from overcharging). In contrast, the prosecutors in this case brought charges for three counts of the same crime against Appellant because the grand jury found probable cause that each of the three officers who faced Appellant at his door was placed in fear of imminent bodily harm. At the trial, Officer Gresham testified that he was not in fear and did not believe he had been assaulted. The trial court dismissed the charge at the close the State's case.

Prosecutorial misconduct does not constitute reversible error unless the outcome was affected to Appellant's prejudice. State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001). Appellant requests that his convictions on other charges be overturned because he was charged with assault of Officer Gresham. Yet Appellant points to no prejudice, aside from a bald assertion that the prosecutors tried to "bolster their case" on other counts. On review, we conclude that there was no prejudicial effect on Appellant as a result of the dismissed charge. Appellant is not entitled to relief on this issue.

## V. JURY INSTRUCTION ISSUES (Issues 8, 9, 10, 11)

### A. Failure To Give Counsel Written Jury Instructions

Appellant contends that the trial court erred by not giving him a written copy of the jury instructions before closing argument. The State contends that the trial court satisfied the

---

[1] This analysis does not, however, apply to counts three and five, which were dismissed by the trial court at the close of the State's proof. The double jeopardy clauses bar retrial on those counts.

Tennessee Rule of Criminal Procedure 30(a)(3) and was not required to provide full written instructions before closing argument. We agree with the State.

With regard to requests for special jury instructions, Rule 30(a)(3) states:

Prior to counsels' closing jury arguments, the court shall inform counsel of its proposed action on:
      (A) the requests for jury instructions; and
      (B) any other portion of the instructions concerning which
      inquiries are made.

This rule does not require the trial judge to provide counsel with full written jury instructions before closing argument. See State v. McKinney, 605 S.W.2d 842, 847 (Tenn. Crim. App. 1980); see also State v. Torrez Talley, No. W2003-02237-CCA-R3-CD, 2006 WL 2947435, at *19 (Tenn. Crim. App. at Jackson, Oct. 16, 2006). Furthermore, this is a misdemeanor case. To read Rule 30 to require the trial court give counsel written instructions prior to closing would run head-long into subsection (c), which provides that "[i]n the trial of all felonies . . . every word of the judge's instructions shall be reduced to writing before being given to the jury." Subsection (c) makes clear that the Rule does not contemplate that the instructions in misdemeanor cases are always even put in writing.

The trial court held a hearing in which it addressed each of Appellant's requested jury instructions. The court informed Appellant of its action on his requests, stating:

here are the instructions that you requested that I will instruct: the Pattern Instructions concerning self-defense; evidence of good character; and the instruction that you submitted, "lawful resistance to the commission of a public offense may be made by the party about to be injured or by others." Those I will instruct.

The trial court complied with Rule 30(a)(3) by informing Appellant of its action with regard to requested jury instructions. Appellant was entitled to nothing more.

**B. Incorrect And Incomplete Jury Instructions**

Appellant next contends that the trial court erred by (1) giving incorrect and incomplete jury instructions regarding reasonable doubt and self-defense and (2) refusing to instruct the jury on lawful resistance to injury to property as well as the difference between his defenses of lawful resistance and self-defense. The State contends that the jury instructions were proper. We agree with the State.

In criminal cases, the trial court has the duty to charge the jury on all of the law that applies to the facts of the case. See State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992) (citing State v. Thompson, 519 S.W. 2d 789, 792 (Tenn. 1975)). Appellant also "has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." Thompson, 519 S.W.2d at 792; see also Tenn. Code Ann. § 39-11-203(c) (a defendant is entitled to have a defense submitted to the jury when it is fairly raised by the proof). However, an erroneous jury instruction is subject to a harmless error analysis. See State v. Garrison, 40 S.W.3d 426, 433-34 (Tenn. 2000).

A jury instruction must be reviewed relative to the instructions in their entirety and read as a whole rather than in isolation. State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)).

## 1. Reasonable doubt instruction

"The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." Victor v. Nebraska, 511 U.S. 1, 5 (1994). "[S]o long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." Id. (citations omitted).

The trial court instructed the jury on the reasonable doubt standard, stating:

> The State has the burden of proving the guilt of [Appellant] beyond a reasonable doubt, and this burden never shifts, but remains on the State throughout the trial of the case. A defendant is not required to prove his innocence.
> A reasonable doubt [is] a fair, honest doubt growing out of the evidence or lack of evidence. It is not an imaginary or possible doubt, but a doubt based on reason and common sense. It is not necessary that [Appellant's] guilt be proved beyond a possible doubt, as absolute certainty of guilt is not demanded by the law to convict of any criminal charge.
> A reasonable doubt is just that, a doubt that is reasonable after a careful and considered examination of the facts and circumstances of this case.
> If you find the State has not proven every element of the offense beyond a reasonable doubt, then you should find Appellant not guilty.

-35-

We note that this instruction is substantially similar to the reasonable doubt standard contained in former versions of the pattern jury instructions:

A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in this case.

It is not necessary that the defendant's guilt be proved beyond all possible doubt, as absolute certainty of guilt is not demanded by the law to convict of any criminal charge.

A reasonable doubt is just that—a doubt that is reasonable after an examination of all the facts in the case.

If you find that the state has not proven every element of the offense beyond a reasonable doubt, then you should find the defendant not guilty.

7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 2.03(a) (4th ed.). This court has upheld the constitutionality and sufficiency of this instruction on multiple occasions. See, e.g., State v. Rico L. Raybon, No. W2001-01303-CCA-R3-CD, 2002 WL 1482719, at *4-5 (Tenn. Crim. App. at Jackson, Mar. 25, 2002); State v. Avis Neal, No. W2001-00374-CCA-R3-CD, 2002 WL 1558621, at *3-4 (Tenn. Crim. App. at Jackson, Jan 28, 2002). The instruction "tracks virtually identical language of pattern reasonable doubt instructions approved by a majority of the federal circuits." State v. Melvin Edward Henning, No. 02CO1-9703-CC-00126, 1997 WL 661455, at *9 (Tenn. Crim. App. at Jackson Oct. 24, 1997) (citing cases). When read as a whole, the trial court's instruction fairly submitted the legal issue and did not mislead the jury as to the applicable law.

## 2. Self-defense instruction

Appellant contends that the trial court erred by using a pattern self-defense instruction that improperly included the term "assault" and by using a pattern instruction provision regarding the use of force against a law enforcement officer making an arrest or search. The State contends that the self-defense instruction was proper and consistent with pattern jury instructions upheld by this court. We agree with the State.

With regard to Appellant's claim that the court used a pattern self-defense instruction that improperly includes the term "assault," we note that the court used the pattern jury instruction in effect at the time of Appellant's offense. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 40.06 (8th ed.) ("When a person is assaulted, by [the use of force] [attempted use of force] in such a way as to create in [his] [her] mind a reasonable belief that [he] [she] is in imminent and actual danger of [death] [serious bodily injury], [he] [she] will be justified in using force to defend [himself] [herself], even to the extent of killing another human being."). This court has held that the pattern jury instruction used by the trial court is "an

accurate statement of the law regarding self-defense." State v. Inlow, 52 S.W.3d 101, 107 (Tenn. Crim. App. 2000). As a result, Appellant is not entitled to relief on this issue.

With regard to Appellant's claim that the trial court erred by including in the self-defense instruction a provision regarding the use of force against a law enforcement officer, the record reflects that Appellant requested the trial court to instruct the jury on the provision that he now claims was improperly charged. In Appellant's motion requesting special jury instructions, Appellant requested the court to instruct the jury on self-defense, including the portion stating:

> The threat or use of force against another is not justified to resist a halt at a roadblock, arrest, search, or stop and frisk that the person knows is being made by a law enforcement officer, unless:
> (1) The law enforcement officer uses or attempts to use greater force than necessary to make the arrest, search, stop and frisk, or halt; and
> (2) The person reasonably believes that the force is immediately necessary to protect against the law enforcement officer's use or attempted use of greater force than necessary.

When a defendant requests a special jury instruction, he may not assert that the court erred in giving the charge as requested. See McKinney, 605 S.W.2d at 847 ("[Because] the charge which the appellant now protests incorporated a portion of one of his own special requests . . . he will not be heard to complain on appeal."). As a result, the trial court did not err by including in the self-defense instruction the provision regarding the use of force against a law enforcement officer. The self-defense instruction in its entirety fairly submitted the legal issues and did not mislead the jury as to the applicable law.

### 3. Lawful resistence to injury to property instruction

Appellant contends that the trial court erred by refusing to instruct the jury on the defense of lawful resistance to injury to property. The State argues that Appellant was not entitled to the instruction. We agree with the State.

An instruction on a defense must be given if fairly raised by the proof regardless of whether the defense relies on the theory or requests that an instruction be given as to that theory. See State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001); see also State v. Allen, 69 S.W.3d 181, 187-88 (Tenn. 2002) . "In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that

defense." Sims, 45 S.W.3d at 9. If evidence has been presented that reasonable minds could accept as a defense, "the accused is entitled to the appropriate instructions." Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975).

Tennessee Code Annotated section 38-2-101 states that "[l]awful resistance to the commission of a public offense may be made by the party about to be injured, or by others." Such resistence "to prevent the offense may be made by the party about to be injured to prevent an [o]ffense against the party's person; or [i]llegal attempt by force to take or injure property in the party's lawful possession." Id. at § 102 (colon and subsection numbers omitted). The trial court charged the jury on sections 101 and 102(1) but rejected Appellant's request to charge the jury on section 102(2) because the evidence did not show that the police officers threatened Appellant's property.

Appellant argues that the proof fairly raised the issue of an illegal attempt by force to injure property in his possession because it showed that Sergeant Evans attempted to enter his apartment by putting his foot in the doorway and because the officers eventually entered and searched his apartment. Taken in the light most favorable to Appellant, the evidence reflects that the officers attempted to enter Appellant's apartment in order to investigate a noise complaint and that any search of or damage to Appellant's apartment was done after arresting Appellant. The evidence does not fairly raise the issue that the officers attempted to enter his apartment by force to take or injure property in Appellant's lawful possession. As a result, the trial court properly refused to charge the jury on section 38-2-102(2). See Allen, 69 S.W.3d at 187-88; Sims, 45 S.W.3d at 9.

**4. Instruction regarding difference between self-defense and lawful resistance**

Appellant contends that trial court erred by refusing to instruct the jury on the difference between lawful resistance and self-defense. The State contends that the court properly instructed the jury on both and was not required to give the instruction that Appellant requested. We agree with the State.

"A trial judge should properly instruct the jury on the law governing issues raised by the evidence introduced at trial. When the trial judge gives instructions that correctly, fully, and fairly set forth the applicable law, it is not error to refuse to give a special requested instruction." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); see also State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001) ("Denial of a special or additional instruction is error only if the trial court's jury charge does not fully and fairly state the applicable law.").

The record reflects that the trial court gave extensive jury instructions regarding self-defense that closely followed the pattern jury instruction in effect at the time of Appellant's offense. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 40.06 (8th ed.). As noted above, this pattern jury instruction is "an accurate statement of the law regarding self-defense." Inlow, 52 S.W.3d at 107. The trial court also gave jury instructions regarding lawful resistance, stating, "[l]awful resistance to the commission of a public offense may be made by the party about to be injured or by others. Resistance sufficient to prevent the offense may be made by the other party about to be injured to prevent an offense against the party's person." This instruction mirrors the language of Tennessee Code Annotated sections 38-2-101 and -102(1). Because the jury instructions on self-defense and lawful resistance fully and fairly stated the applicable law, we hold that the trial court did not err by refusing to give a special instruction on the difference between the two defenses.

## VI. EXCLUSION OF NEWSPAPER ARTICLES (Issue 12)

Appellant contends that the trial court erroneously excluded newspaper articles about the underlying offense as hearsay evidence and that this exclusion denied him the constitutional right to present a complete defense. The State contends that the articles were properly excluded as hearsay and did not deprive Appellant of the right to a complete defense because the excluded articles were not critical to his defense. We agree with the State.

Hearsay is an out-of-court statement offered in court "to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). The Rules of Evidence provide that "[h]earsay is not admissible except as provided by these rules or otherwise by law." Id. 802. "[A] newspaper article is not admissible evidence under the hearsay rule." State v. Henretta, 325 S.W.3d 112, 2010 WL 3852043, at *24 (Tenn. 2010) (citing State v. George E. Martin, Jr., No. 02C01-9512-CC-00389, 1997 WL 471158, at *6 (Tenn. Crim. App. at Jackson, Aug. 18, 1997) ("[T]he content of newspaper articles is hearsay that does not fall within an exception to the hearsay rule.")).

Although Appellant argues that he sought to introduce these articles pursuant to Tennessee Rule of Evidence 616 to show witness bias and prejudice, the record reflects that Appellant sought to introduce these articles as a public record or report pursuant to Tennessee Rule of Evidence 803(8). Furthermore, Appellant sought to introduce these articles to establish the dates and sequence of events. These newspaper articles were not admissible under Tennessee Rule of Evidence 803(8) because they were not created by a public office or agency and did not "set[] forth . . . matters observed pursuant to a duty imposed by law as to which matters there was a duty to report." Tenn. R. Evid. 803(8). These articles were hearsay not falling within an exception to the hearsay rule. We conclude that the trial court did not err by excluding this evidence on the basis of hearsay.

-39-

Having determined that the evidence was inadmissible hearsay, we turn to Appellant's constitutional arguments. The "Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense." State v. Brown, 29 S.W.3d 427, 432 (Tenn. 2000). In appropriate cases, this right surpasses the hearsay rules. See id. at 433. However, in many other situations, Appellant's due process right "must yield to other legitimate interests in the criminal trial process," including "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Id. at 432 (quoting Chambers v. Mississippi, 410 U.S. 284, 295 & 302 (1973)) (quotation marks omitted). Our state supreme court has said:

> The facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence. Generally, the analysis should consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important.

Id. at 433-34 (citing Chambers, 410 U.S. at 298-301).

In the present case, the evidence excluded was not critical to the defense. Appellant sought to introduce these articles to establish a timeline of events and to establish that the police officers indicted him on new charges after learning that he filed a lawsuit against them. The record reflects that Appellant cross-examined the officers regarding the timeline of events, asked them questions regarding the newspaper articles, and mentioned the dates of the articles. Appellant also established on cross-examination that the officers were served with Appellant's civil lawsuit on the same day (May 5, 2004) that they appeared before a grand jury, which was the same day the grand jury issued its presentment against Appellant. As a result, the exclusion of the newspaper articles did not deny Appellant the opportunity to present pivotal, otherwise unknown, information to the jury.

The interest in excluding unreliable and inaccurate hearsay testimony is an important one. See generally Neil P. Cohen et al., Tennessee Law of Evidence § 8.01[3][a] (5th ed. 2005). Application of the Rules of Evidence did not deprive Appellant of due process. The trial court did not deny Appellant the opportunity to establish a timeline of events or present his theory that the officers indicted him after learning that he filed a civil suit against them. Given these facts, we hold that the trial court did not infringe upon Appellant's due process right to present a defense.

## VII. SIXTH AMENDMENT RIGHT TO CONFRONT WITNESSES (Issue 13)

Appellant contends that the trial court violated his Sixth Amendment right to confront witnesses by erroneously denying him the right to cross-examine Sergeant Evans regarding his grand jury testimony and to cross-examine Officer Tipton regarding his communication with attorneys in the civil lawsuit. The State concedes that the trial court erred in denying cross-examination regarding grand jury testimony but argues that the State did not assert an attorney-client privilege with Officer Tipton. The State contends that any resulting error was harmless. We agree that the trial court erred but hold that the errors were harmless.

A defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination. Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987); Brown, 29 S.W.3d at 430-31. Denial of Appellant's right to effective cross-examination is "constitutional error of the first magnitude" and may violate Appellant's right to a fair trial. State v. Hill, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting Davis v. Alaska, 415 U.S. 308, 318 (1974)). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the discretion of the trial court." State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). Furthermore, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation." State v. Reid, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). We will not disturb the limits that a trial court has placed upon cross-examination unless the court has unreasonably restricted the right. Dishman, 915 S.W.2d at 463.

Appellant first argues that his right to confrontation was violated when he was not allowed to cross-examine Sergeant Evans regarding his grand jury testimony. During defense counsel's cross-examination of Sergeant Evans, the State objected to the following question: "And you testified before the Grand Jury, not that you had a resisting arrest, but that you were assaulted?" The trial court sustained the objection based on the secrecy of grand jury proceedings and would not allow defense counsel to cross-examine further on grand jury testimony.

Tennessee Rule of Criminal Procedure 6(k)(1) states in pertinent part: "Every member of the grand jury shall keep secret the proceedings of that body and the testimony given before it." In the hearing on Appellant's Motion for New Trial, the State conceded that the secrecy rule applied to members of the grand jury, not to witnesses, and the succeeding trial court judge agreed. We conclude that because Rule 6(k)(1) does not apply to grand jury witnesses' subsequent statements about their own testimony, the trial court violated Appellant's right to confrontation during cross-examination on this issue. See Tenn. R.

Crim. P. 6(k); see also Butterworth v. Smith, 494 U.S. 624 (1990) (holding a Florida statute that prohibited grand jury witnesses from speaking about their own testimony to be unconstitutional). We must now determine the error's impact on the proceedings.

"[V]iolations of the Confrontation Clause are subject to harmless error review." State v. Gomez, 163 S.W.3d 632, 647 (Tenn. 2005), rev'd on other grounds, Gomez v. Tennessee, 127 S. Ct. 1209 (2007); see also Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986)). Therefore, we must determine whether the constitutional error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24 (1967).

In the hearing on the Motion for New Trial, defense counsel explained that by cross-examining Sergeant Evans on his grand jury testimony regarding his accusations against Appellant, he hoped to show that Sergeant Evans testified to an alleged assault against Officer Gresham and that Sergeant Evans was motivated to bring charges by the civil lawsuit that Appellant brought against the Sheriff's Department. The trial court denied relief because the jury heard "a great deal of testimony about bias, prejudice, motives of the various State witnesses." The record shows that defense counsel extensively cross-examined all three officers regarding when they learned of the civil lawsuit and their motives for arresting Appellant and for testifying. Because the trial court dismissed the charge of assault against Officer Gresham and because the jury had ample opportunity to hear testimony on bias and motives, we conclude that the trial court's exclusion of Sergeant Evans's grand jury testimony was harmless beyond a reasonable doubt.

Appellant also argues that his right to confrontation was violated when he was not allowed to cross-examine Officer Tipton regarding his communication with attorneys about the civil lawsuit. During cross-examination, Officer Tipton agreed that he met with attorneys representing him in Appellant's civil lawsuit against the Sheriff's Department. Defense counsel then asked Officer Tipton if he had explained what he meant by "defensive stance" on his arrest report to his attorneys. After Officer Tipton expressed uncertainty about what was covered by the attorney-client privilege, the following exchange occurred:

[Witness]: What I reviewed with my attorney in private was attorney client privileged.
[Defense]: You're asserting a privilege not to answer that question?
[Witness]: When I discussed that with my attorney, it was in private. And I think they were very adamant during depositions—
[Defense]: I'm not worried about them, sir. I'm asking you.
[Witness]: I understand that, sir.
[Defense]: Are you saying that you're asserting an attorney client privilege? Don't look at the prosecutors.

| [State]: | We're not asserting any attorney client. |
|---|---|
| [Witness]: | They're not— |
| [Defense]: | Are you? |
| [Witness]: | With [the witness's civil attorney] is who I— |
| [Defense]: | If you're telling me that you're asserting an attorney client privilege with what you're talking to the attorneys . . . in that case, all you have to do is say, "Yes, I'm asserting an attorney client privilege." |
| [Witness]: | I apologize. It's been awhile since I've testified—a long time since I've testified in a court. But what I discussed with them in private, in their office, I would like to keep that. |
| [Defense]: | So you are asserting a privilege? |
| [Witness]: | Yes, sir. |
| [Defense]: | Move that his testimony be stricken in this case, your Honor. He has a right to assert his privilege, but when he does, his testimony must be stricken. |

The trial court denied Appellant's motion to strike Officer Tipton's testimony. After a conference held outside the presence of the jury, defense counsel resumed cross-examination and questioned Officer Tipton extensively regarding what he meant when he wrote "defensive stance" in the arrest report and how that compared to his deposition and direct examination testimony.

The attorney-client privilege prohibits an attorney from "giving testimony against a client or person [whom he] consulted" or from disclosing "any communication" made to the attorney "during the pendency of the suit, before or afterward, to the person's injury." Tenn. Code Ann. § 23-3-105. The client may not claim the attorney-client privilege as a means of refusing to disclose a matter during testimony. See Tenn. R. Evid. 501(2). As one of the prosecutors noted to the trial court, Officer Tipton appeared to be confused about the law regarding attorney-client privilege when he asserted it in response to defense counsel's repeated questions. The trial court allowed the cross-examination to continue after a conference in which each side accused the other of misconduct and defense counsel moved for a mistrial. The trial court denied the motion for mistrial and resumed proceedings without instructing the witness as to the law underpinning the attorney-client privilege.

It is not clear from the record that Officer Tipton would have persisted in not answering defense counsel's question regarding his statements to his attorneys if he had understood the privilege that defense counsel prompted him to assert. The trial court may have been able to avoid some confusion by giving an explanation of the law, but there was no error in the court's denial of Appellant's motion to strike all of Officer Tipton's testimony

because Officer Tipton disclosed what he meant by "defensive stance" in his answers to other questions on cross-examination.

## VIII.  JURY SELECTION (Issue 14)

Appellant contends that the trial court abused its discretion by incorrectly limiting the subject and manner of questioning allowed during jury selection.  Appellant argues that the trial court erred by (1) not allowing defense counsel to make brief, non-argumentative remarks to potential jurors to explain the general nature of the case; (2) limiting defense counsel's questions to potential jurors; (3) not allowing defense counsel to question jurors individually; (4) using an incorrect standard to determine if jurors were qualified; (5) denying additional peremptory challenges; and (6) not informing counsel that an alternate juror would be impaneled in time to allow for an additional peremptory challenge.  The State contends that the trial court did not abuse its discretion in limiting the scope of jury selection questioning and that Appellant has not shown prejudice.  Although we conclude that there were errors in the voir dire process, we agree with the State.

Control of voir dire is within the sound discretion of the trial court and will not be found to be in error unless Appellant shows that he was prejudiced.  State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993).  Our supreme court has ruled that "[t]he ultimate goal of voir dire is to insure that jurors are competent, unbiased, and impartial."  State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994).

First, Appellant argues that the trial court erred by not allowing defense counsel to make brief, non-argumentative remarks to potential jurors to explain the general nature of the case.  The State argues that defense counsel did not invoke the right to make introductory remarks and that Appellant has not shown that he was prejudiced by the trial court's description of the general nature of the case.  We agree with the State.

Tennessee Rule of Criminal Procedure 24(a)(2) provides that "[a]t or near the beginning of jury selection, the court shall permit counsel to introduce themselves and make brief, non-argumentative remarks that inform the potential jurors of the general nature of the case."

The record shows the following exchange as the trial court gave counsel instructions for voir dire:

[Defense]:     Would you—do you like us counsel to stand up within a 45 minute—45 second like introduction as to what the case is

> about, the time, place, parties? Very quickly, just to let them
> know what the case is about?
>
> [Court]:      I think I can handle that.
>
> [Defense]:   Okay.  All right.

The trial court gave an introduction explaining the charges and the names of the parties involved.  Defense counsel did not request that he be allowed to give further introduction before or after the court's comments.  Appellant also offers no argument or proof establishing that he suffered prejudice from allowing the trial court to introduce the nature of the case.  Appellant is not entitled to relief on this issue.

Second, Appellant argues that the trial court improperly limited defense counsel's questions to potential jurors regarding court officers, thereby restricting his ability to determine which potential jurors should be challenged.  The State argues that the trial court acted within its authority by limiting questions to matters relevant to the jurors' qualifications.  We agree with the State.

Appellant relies on Tennessee Code Annotated section 22-3-101, which states, "attorneys shall have an absolute right to examine prospective jurors . . . notwithstanding any rule of procedure or practice of court to the contrary."  He also relies on Tennessee Rule of Criminal Procedure Rule 24(c), which states, "[a]fter the court has tentatively determined that the jury meets the prescribed qualifications, counsel may conduct further examination."

The record reflects that defense counsel attempted to ask potential jurors whether they would be prejudiced by "going to lunch with Knox County Sheriff's Department Deputies" or the fact that their "host in this case [would] be Knox County Sheriff's Department Deputies."  The trial court sustained an objection to this line of questioning because the host for the jurors would be the Knox County Government, not the Knox County Sheriff's Department, and Knox County Government would be paying for the jurors' lunches.  The trial court permitted defense counsel to question the jury on their experiences with police officers, whether the jurors would be influenced at trial by being in the presence of Sheriff's Deputies, and whether the jurors had heard of lawsuits against Sheriff's Deputies.  Appellant has not shown that the trial court abused its discretion in limiting the scope of his questions or that he suffered prejudice as a result.

Third, Appellant argues that the trial court erred in not allowing defense counsel to question potential jurors individually at the start of voir dire.  The State argues that the trial court only denied Appellant's request to question all jurors individually at the beginning of voir dire and that this denial was not an abuse of discretion.  We conclude that Appellant has not shown an abuse of discretion or that he was prejudiced.

A defendant is entitled to individual voir dire if a significant possibility exists that a juror knows about potentially prejudicial information. See State v. Claybook, 736 S.W.2d 95, 100 (Tenn. 1987). The record reflects that the trial court required defense counsel at the start of voir dire to address questions to the entire jury pool regarding their knowledge of lawsuits involving the Sheriff's Department. While most of the jurors mentioned hearing of such lawsuits generally, only two jurors stated that they had specific knowledge and opinions relating to these lawsuits. The trial court permitted defense counsel to conduct individual voir dire with the jurors who expressed knowledge and opinions of lawsuits involving the Sheriff's Department. Appellant has not shown that the trial court abused its discretion in requiring him to address questions to the entire jury before permitting individual voir dire of jurors who expressed knowledge and opinions of potentially prejudicial information. Appellant also offers no proof establishing that he suffered prejudice as a result. Appellant is not entitled to relief on this issue.

Fourth, Appellant contends that the trial court used an incorrect standard to determine whether jurors were qualified to sit on the jury because it allowed jurors who had heard of lawsuits against the Sheriff's Department to sit on the jury and allowed a juror who had a son-in-law who worked for the Sheriff's Department to sit on the jury. The State contends that Appellant has not shown that he was prejudiced. We agree with the State.

Rule 24(c) states that a judge shall excuse a juror for cause if:

(B) The prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror. The court shall consider both the degree of exposure and the prospective juror's testimony as to his or her state of mind. A prospective juror who states that he or she will be unable to overcome preconceptions is subject to challenge for cause no matter how slight the exposure. If the prospective juror has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his or her judgment will be affected, the prospective juror's acceptability depends on whether the court believes the testimony as to impartiality. A prospective juror who admits to having formed an opinion about the case is subject to challenge for cause unless the examination shows unequivocally that the prospective juror can be impartial.

Tenn. R. Crim. P. 24(c)(2)(B). Appellant has not argued what standard the trial court applied when seating the jurors or how it incorrectly applied Rule 24(c).

While the record reflects that many members of the jury had heard of previous

lawsuits involving the Sheriff's Department, the jurors stated that such knowledge would not prejudice their views of Appellant's case. Although one juror expressed a negative view of these lawsuits in general, stating that they were "a big waste of time and money," the same juror also stated that the lawsuits were not frivolous and that she "probably would do the same thing" under the circumstances. None of the jurors expressed an opinion of Appellant's case. Furthermore, the juror who stated that her son-in-law worked for the Sheriff's Department also stated that her son-in-law worked in the radio shop at the department, that she never talked with him about his work, and that her relationship with her son-in-law would not prejudice her ability to serve as a juror. The record reflects that the seated jurors had minimal exposure to potentially prejudicial information and that they testified that this exposure would not prejudice or compromise their ability to serve as jurors. Appellant has not established that the trial court abused its discretion by seating these jurors or that he was prejudiced as a result. Appellant is not entitled to relief on this issue.

Fifth, Appellant argues that the trial court erred in denying him three additional peremptory challenges. However, Appellant waived this issue by neglecting to cite any authority for his claim that the trial court abused its discretion by refusing to grant additional peremptory challenges. See Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).

Finally, Appellant argues that the trial court erred by not informing counsel that an alternate juror would be impaneled before the opportunity to exercise an additional peremptory challenge had passed. The State argues that any error the trial court made by not informing counsel of the alternate juror was procedural and did not cause prejudice to Appellant. We agree with the State.

Tennessee Rule of Criminal Procedure 24(e)(4) provides that for each additional juror selected in addition to the regular jury, "each side is entitled to one peremptory challenge for each defendant." Additional jurors are subject to the same challenges as regular jurors. Tenn. R. Crim. P. 24(f)(1). The right to exercise peremptory challenges necessarily ends when both sides have accepted the jury.

At the beginning of the trial, the trial court instructed counsel that it would seat twelve prospective jurors in the jury box and strike jurors from there. The court instructed counsel to address questions to all eighteen in the jury pool. Once the twelve jurors were chosen and both sides had exercised their challenges, prosecutors and defense counsel questioned a prospective alternate juror. But the parties were not informed that they would have an additional strike until after accepting the first twelve jurors. Ultimately, both sides accepted the alternate juror.

We conclude that the trial court erred by ending the challenge phase of jury selection

before selecting the alternate juror and bestowing the additional strike. See Tenn. R. Crim. P. (24)(e)(4). But to be entitled to relief on this issue, Appellant must show that he was prejudiced by the composition of the jury. See Howell, 868 S.W.2d at 247. Appellant offers no proof of actual prejudice, and both sides were subject to the same error. Appellant is not entitled to relief on this issue.

## IX. EXCLUSION OF TESTIMONY AND MOTION TO QUASH (Issue 15)

Appellant contends that his right to present a complete defense was violated when the trial court excluded Ms. Ingram's testimony and when the trial court granted the State's Motion to Quash subpoenas against Knox County Sheriff Timothy Hutchison, Chief Deputy Thomas Spangler, and Chief Deputy James J.J. Jones. First, the State contends that Appellant waived the claim that Ms. Ingram's testimony had been erroneously excluded by offering only a conclusory statement to that effect in his brief. Second, the State contends that Appellant is not entitled to relief based on the quashed subpoenas because the subpoenas were later served during trial and the witnesses made available. We agree with the State, and we also conclude that Ms. Ingram's testimony was not excluded because the trial court reinstated it before jury deliberations.

Appellant argues that the trial court "improperly struck the testimony of Defense Witness Lori Ingram because of a dispute as to whether she was in the courtroom during voir dire." Appellant cites the trial transcript but gives no other rationale or authority to support this argument. Moreover, Appellant's sole citation regarding the exclusion of Ms. Ingram's testimony is to the point in the trial transcript when the trial court ordered the jury to disregard Ms. Ingram's testimony because she was present during voir dire. He does not cite the trial court's order immediately afterward to have the court reporter check the tape of the proceedings and determine if Tennessee Rule of Evidence 615 (regarding exclusion of witnesses) was invoked before or after voir dire. He also declines to mention that the trial court reinstated Ms. Ingram's testimony when it discovered, before the end of the proceeding, that the Rule had been invoked after voir dire. See Tenn. R. Evid. 615 (leaving to the court's discretion whether the rule is invoked before or after voir dire). Regardless, Appellant waived this issue by offering no argument or support and by citing only half of the trial court's action in the record. See Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b); see also State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997) (concluding that where there was only one reference to the record and no authority cited to support an issue raised on appeal, it was not the obligation of the appellate court to review the issue as presented).

As to the State's Motion to Quash the subpoenas of Sheriff Hutchison, Chief Deputy Spangler, and Chief Deputy Jones, the court did so on August 19, 2005, when it heard proof

that the subpoenas had not been served. Appellant is correct that to quash a "properly issued and executed" subpoena, the trial court must hear evidence to determine whether the requesting party is abusing the compulsory process, such as by subpoenaing individuals who are without knowledge of the case. See State v. Womack, 591 S.W.2d 437, 443-44 (Tenn. Ct. App. 1979). In this case, though, the subpoenas had not been properly executed because they had not been served.

Immediately after granting the Motion to Quash, the trial court ordered a court officer to serve the three potential witnesses with subpoenas at defense counsel's request. All three witnesses were served and available for the next three days of the trial. Yet despite all of the fuss, Appellant never called any of them. At the close of Appellant's case, one of the prosecutors asked defense counsel if the potential witnesses could be released, and defense counsel replied, "[c]ertainly." We conclude that the trial court did not deny Appellant compulsory process or a complete defense. Appellant is not entitled to relief on this issue.

## X. CHANGE OF VENUE (Issue 16)

Appellant contends that the trial court erred by refusing to change the venue of the trial because of adverse pretrial publicity, adverse financial interests of Knox County citizens, and the adverse effect caused by the presence of Knox County Sheriff's deputies during trial. The State contends that Appellant is not entitled to relief because he has not shown that the jurors were biased or prejudiced against him. We agree with the State.[2]

"The ultimate goal of voir dire is to see that jurors are competent, unbiased, and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court." Howell, 868 S.W.2d at 247. "[J]urors need not . . . be totally ignorant of the facts and issues" of the case. Murphy v. Florida, 421 U.S. 794, 800 (1975). Indeed, "[t]he mere fact that prospective jurors know something about a case at the time of impaneling is not unusual," and such exposure "does not automatically constitute constitutional error." State v. Hugueley, 185 S.W.3d 356, 390 (Tenn. 2006). To prohibit the qualification of a juror with "any preconceived notion as to the guilt or innocence of an accused . . . would be . . . an impossible standard." Murphy, 421 U.S. at 800 (quotation marks omitted). "Accordingly, jurors may sit on a case, even if they have formed an opinion

---

[2] Before we delve into the merits of this claim, we pause to address a disquieting statement in Appellant's brief. Nearly a page into Appellant's seven-page section dealing with venue and the propriety of the Knox County Sheriffs Department guarding the jury, Appellant informs the court that "[b]ecause of limitations on pages, [he] adopts the legal authorities cited in the memorandums he filed in support of each motion." If Appellant were to leave it at that, it would plainly be inadequate. See Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). However, the remainder of the section refers to a handful of legal authorities. We conclude that these meager citations are enough to avoid waiving the issue.

on the merits of the case, if they are able to set that opinion aside and render a verdict based upon the evidence presented in court." State v. Mann, 959 S.W.2d 503, 531 (Tenn. 1997); see also Tenn. R. Crim. P. 24, cmt.

Tennessee Rule of Criminal Procedure 21 provides that a trial court may change venue "when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." Tenn. R. Crim. P. 21(a). The decision to change venue rests in the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. See State v. Crenshaw, 64 S.W.3d 374, 386 (Tenn. Crim. App. 2001). As noted above, the fact that prospective jurors have been exposed to pre-trial publicity is not sufficient to warrant a venue change. "Moreover, before an accused is entitled to a reversal of his conviction on the ground that the trial judge erroneously denied his motion for a change of venue, *he must demonstrate that the jurors who actually sat were biased and/or prejudiced.*" Mann, 959 S.W.2d at 532 (quotation marks, brackets, and ellipses omitted; emphasis added). To be sure, press coverage and inflammatory publicity can corrupt a trial atmosphere, see, e.g., Dobbert v. Florida, 432 U.S. 282, 303 (1977), but "the court will not presume that the jury's exposure to news reports regarding . . . the charged offense without more deprives the defendant of due process," Crenshaw, 64 S.W.3d at 387. Indeed, the United States Supreme Court's recent decision in the case of former Enron executive Jeffrey Skilling demonstrates that even significant pre-trial publicity does not necessitate a change of venue. Skilling v. United States, 130 S. Ct. 2896, 2907-25 (2010) (noting, among other things, that "[j]urors . . . need not enter the [jury] box with empty heads in order to determine the facts impartially"). In short, Appellant has a very tall burden to overcome in demonstrating that the specific jurors empaneled in his trial were biased or prejudiced against him. See, e.g., State v. Rogers, 188 S.W.3d 593, 622 (Tenn. 2006); State v. Thacker, 164 S.W.3d 208, 238 (Tenn. 2005); State v. Melson, 638 S.W.2d 342, 360 (Tenn. 1982); Crenshaw, 64 S.W.3d at 386-88.

Our courts have generally relied upon seventeen factors to aid in the evaluation of a motion for a change of venue. Those factors include the: (1) nature, extent, and timing of pre-trial publicity; (2) nature of publicity as fair or inflammatory; (3) particular content of the publicity; (4) degree to which the publicity complained of has permeated the area from which the venire is drawn; (5) degree to which the publicity circulated outside the area from which the venire is drawn; (6) time elapsed from the release of the publicity until the trial; (7) degree of care exercised in the selection of the jury; (8) ease or difficulty in selecting the jury; (9) veniremen's familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire; (10) defendant's utilization of his peremptory challenges; (11) defendant's utilization of challenges for cause; (12) participation by police or by prosecution in the release of publicity; (13) severity of the offense charged; (14) absence or presence of threats, demonstrations or other hostility against the defendant; (15) size of the

area from which the venire is drawn; (16) affidavits, hearsay or opinion testimony of witnesses; and (17) nature of the verdict returned by the trial jury. See State v. Hoover, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979).

With regard to adverse pretrial publicity, Appellant argues that the jury was prejudiced because eleven of twelve jurors admitted they had heard of previous lawsuits involving defense counsel and the Sheriff's Department and because one seated juror expressed a negative opinion of those lawsuits during voir dire. We have already addressed this issue with regard to the jury selection procedures. Furthermore, as we explained above, mere exposure of the jury to pretrial publicity did not warrant a change of venue, and prejudice will not be presumed from such exposure. See, e.g., Mann, 959 S.W.2d at 531-32. None of the jurors indicated that their prior knowledge would prejudice their views of Appellant's case. Moreover, while the record reflects that the jurors had heard of previous suits involving defense counsel, it does not reflect that they were exposed to or prejudiced by information regarding Appellant's lawsuit. Appellant has not established that the jury panel was prejudiced by pretrial publicity.

With regard to adverse financial interests of Knox County citizens, Appellant argues that the jurors were biased and motivated to convict him because the jurors, as taxpayers of Knox County, would contribute to any judgment received in Appellant's civil case. He argues that there are no unbiased jurors in Knox County because Knox County Code section 2-286 provides that the county will pay any judgments awarded against police officers. The record does not reflect that the jurors knew of this provision or that it caused them to be prejudiced against Appellant, and Appellant has not demonstrated otherwise.

Appellant also contends Supreme Court Rule 10, Canon 3(a) (regarding judicial disqualification) should be extended to the circumstances of this case. We see no need for such an expansion here nor any authority requiring us to apply the canon. Appellant cites no authority adopting his position that potential jurors are, as a matter of law, biased in a criminal trial where their verdict may have some tangential impact on a civil suit arising out of the same facts for which the jurors' tax money may go to pay damages if they are later awarded. Moreover, Appellant has not established that the jury panel was prejudiced by virtue of being Knox County taxpayers. He is entitled to no relief on that argument.

With regard to juror bias caused by the presence of Knox County Sheriff's deputies at trial, Appellant argues that the deputy in charge of the jury had strong personal views regarding suits against Sheriff's deputies. Although he argues that jurors must have been exposed to the deputy's views because they were in her custody during the five-day trial, he does not allege any specific instance in which the deputy mentioned her views to the jury. The record reflects that one juror overheard Sergeant Evans's improper comment but was

excused from the jury, removing any prejudicial effect that the comment may have had. The record does not reflect that the jurors were prejudiced by the presence of Knox County Sheriff's deputies at trial, and Appellant has not demonstrated otherwise. Indeed, although the jury deliberations were faulty, the jury still returned an acquittal, demonstrating that the jurors did not feel constrained to return guilty verdicts to appease the Sheriff's Department. Appellant is not entitled to relief on this issue.

## XI. RIGHT TO SPEEDY TRIAL (Issue 17)

Appellant contends that the trial court denied his right to a speedy trial by delaying thirty-one months before ruling on his motion for new trial. He argues that as a result of the trial court's delay, his convictions served as a continuing bar to his civil action against the arresting officers. The State contends that Appellant is not entitled to relief because he has not established that he experienced prejudice due to the delay. We agree with the State.

Once the State initiates criminal proceedings, the right to a speedy trial is implicated under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. This is also a statutory right in Tennessee. Tenn. Code Ann. § 40-14-101. In Barker v. Wingo, the Supreme Court devised a balancing test to determine whether a defendant received a speedy trial and identified the following factors for consideration: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant. 407 U.S. 514, 530 (1972). In State v. Bishop, the Tennessee Supreme Court implicitly adopted the Barker balancing test for our state's constitutional and statutory right to a speedy trial. 493 S.W.2d 81, 83-85 (Tenn. 1973). We have previously determined that the right to a speedy trial encompasses the sentencing proceedings in a criminal prosecution. See State v. Joseph Hart, No. 02C01-9902-CC-00075, 1999 WL 737780, at *3-4 (Tenn. Crim. App. Sept. 20, 1999). This court has also considered whether the right to a speedy trial was violated when a trial court delayed three years in ruling on a post-trial motion for a new trial. State v. Thomas Dee Huskey, No. E1999-00438-CCA-R3-CD, 2002 WL 1400059, at *143-44 (Tenn. Crim. App. at Knoxville, June 28, 2002).

Appellant does not assert that he has suffered prejudice in his appeal of his assault and disorderly conduct convictions as a result of the delayed ruling on his motion for new trial. His claim of prejudice—that his conviction barred his suit in federal court—instead relates to his civil trial. Appellant has failed to present any prejudice to this case flowing from the trial court's delayed ruling. See State v. Wood, 924 S.W.2d 342, 348 (Tenn. 1996) (describing prejudice "as the most important" factor in the Baker analysis). We conclude that the delay did not violate Appellant's rights.

## CONCLUSION

Upon thorough review, the judgments of the trial court are reversed, and this case is remanded for a new trial.  Because counts three and five were dismissed by the trial court at the close of the State's proof, Appellant may not be retried on those counts.

_____

NORMA McGEE OGLE, JUDGE